scars that were consistent with inflicted injury, but it was impossible for Konzelmann to tell how the injuries had occurred, what instrument caused the injuries, or how long ago they had occurred.[77]

On cross-examination, Konzelmann said Davontae had been suffering from a cold and congestion, and had been given NyQuil, which contained a powerful sleep aid, prior to his death.[78]   Konzelmann found what appeared to be chicken noodle soup and PediaSure in Davontae's stomach, which indicated that he had eaten recently.[79] Davontae also had a creamy tan liquid that appeared to be a substance such as PediaSure in his trachea and bronchial area, which could have been evidence of aspiration.[80] Despite the vomit in Davontae's nose and mouth, Konzelmann ruled out obstruction of the airway and concluded that based on the totality of the evidence, Davontae's death did not appear to be caused by aspiration pneumonia.[81]   Konzelmann also opined that Davontae's death was the result of multiple intentional acts, none of which were probably intended to cause Davontae's death.[82]   Konzelmann conceded that vomiting was a common cause of aspiration pneumonia, and that such incidences occurred when people

---

77 RR 29 @ 208, 218
78 RR 29 @ 153, 156-58, 186
79 RR 29 @ 124, 178-181
80 RR 29 @ 176, 188-89, 192
81 RR 29 @ 126-28, 193, 204
82 RR 29 @ 200

30

vomited while unconscious or semiconscious.[83]   He admitted that it was plausible that

Davontae's gag reflex had been inhibited as a result of the NyQuil he had ingested.[84]

Over the defense's objection, the State introduced the testimony of Child

Protective Services ("CPS") investigators Jennifer Deible and Edna Campbell.[85]   At a

pre-trial hearing on the admissibility of the CPS employees' testimony, Appellant argued

that they had become *de facto* agents for the Arlington Police Department and had

violated her constitutional rights, including her right to counsel, when they failed to

follow established CPS policies and procedures and statutory guidelines in conducting

their investigation.[86]   At the conclusion of the hearing, the trial court denied Appellant's

motion to suppress evidence.   Specifically, the court found that Appellant had failed to

show that Deible and Campbell were acting as agents for law enforcement, and that

Appellant's statements to the CPS workers was voluntary and did not stem from custodial

interrogation by law enforcement officers or agents.[87]

Over Appellant's running objection, Deible testified that she and Campbell had

visited Appellant in the Arlington jail on July 27 to inform Appellant that her son was

being placed in foster care.[88]   Deible, suspicious that Appellant had been untruthful in

---

83 RR 29 @ 182
84 RR 29 @ 170
85 RR 26 @ 117-135, RR 30 @160, 174-75
86 RR 26 @ 117-121
87 RR 26 @ 131-33
88 RR 30 @ 160

her statement to the Arlington Police, returned with Campbell to interrogate Appellant several days later.[89]

Deible testified that from information gathered from Appellant's family members, she had concluded that Appellant had been living in the apartment with Williams and her children for many months preceding Davontae's death.[90]   Deible told the jury that as soon as a person moves in with another individual, CPS considers the live-in partner to be a "care giver" for any children residing in the home.[91]

Deible also concluded that Appellant had used "force" to discipline Davontae and said that in her opinion, Coleman had assumed a level of care, custody and control over Davontae.[92]   Deible also said that Appellant was considered a care giver because Appellant had said that "she was the best thing to ever happen to [Williams] and those kids," and because she cared for Davontae when Williams was not at home.[93]

According to Deible, Appellant said that Davontae had been sick for at least three weeks, seemed to have lost weight in that period, and had been throwing up and had diarrhea.[94]   Appellant's sister, Trina, had advised Appellant and Williams to get medical help for Davontae, but they treated him at home with Pedialyte, PediaSure, TheraFlu, and

---

89 RR 25 @ 238-240
90 RR 30 @ 195, 234
91 RR 30 @ 187
92 RR 30 @ 181, 187, 196; RR 31 @ 31
93 RR 30 @ 196
94 RR 30 @ 190-192

Alka Seltzer.[95] The Sunday night before Davontae died, he was walking and talking, ate a little chicken soup and ribs, and appeared normal.[96] Appellant swore that she did not know how Davontae was injured, but later admitted that the injury to his lip and some of his bruises were caused when she pushed him into a bar stool.[97]

Appellant told Deible that Williams would sometimes tell other people that Davontae was gone when he was actually in the apartment.[98] Appellant said that she and Williams had once caught Davontae in the kitchen with the stove turned on in the middle of the night and were concerned that he would injure himself or the other occupants of the apartment if they did not restrain him.[99]

Deible testified that Appellant told her that Williams was the person who tied up Davontae with the electrical cords.[100] When Deible asked how Davontae received the sores on his arms, Appellant said they were probably caused when he tried to get loose while tied up.[101] Appellant explained that Davontae had to be restrained sometimes because he was tearing things up in the apartment while others were sleeping.[102] They were also afraid he might get into poison that had been put out around the apartment for

---

95 RR 30 @ 230-31
96 RR 30 @ 190-91
97 RR 30 @ 192
98 RR 30 @ 191
99 RR 30 @ 192, 31@ 44-45
100 RR 30 @ 193
101 RR 30 @ 193
102 RR 30 @ 193

33

bugs or rodents.[103]

Campbell also testified concerning Appellant's interview with CPS. Campbell stated that Appellant told her she had only tied Davontae up twice, with clothing, and those infrequent occurrences of restraint happened out of her concern for his protection.[104] Appellant said that because Davontae was congested with a bad cold, he would often throw up the little food that he would eat.[105] Williams did not take Davontae to a doctor because she was afraid that CPS would be called and her children would be taken away.[106] Campbell testified that of the six CPS referrals regarding Williams' children, only one incident in 1999 pertained to Appellant.[107] The remainder of the referrals involved various allegations of negligent care and failure to supervise on Williams' part.

In addition to the CPS workers, Williams' daughter, Destinee Hatten, who was eight at the time of trial, testified for the State. Destinee claimed that Appellant tied up Davontae with an extension cord in the bathroom and that her mother had never tied up Davontae.[108] She did, however, admit that Williams spanked her children with belts,

---

103 RR 30 @ 193
104 RR 31 @ 63, 101
105 RR 31 @ 63
106 RR 31 @ 63-64
107 RR 31 @ 71-72; 31 @ 111-112
108 RR 30 @ 40-41, 51

34

clothes hangers, and extension cords.[109]

Michael Floyd, a forensic investigator for the Tarrant County medical examiner's office, testified that he was called to photograph the crime scene.[110]   According to Floyd, Davontae appeared to be a victim of abuse and his body exhibited chronic, repetitive injuries.[111]  Floyd photographed the pantry at Williams' house, which had a lock on it and contained a stain on the floor that smelled like urine.[112]

Dr. Nancy Kellogg, a pediatrician, testified that after examining:  Davontae's medical records, the notes from the autopsy, and photographs from Williams' home, she had concluded that Davontae was malnourished.[113]   In addition, in reviewing Konzelmann's findings, photographs and body chart, Kellogg counted more than 250 wounds and scars on his body at death.[114]

Relying on Davontae's medical history and after looking at a photo taken two years before his death in which he seemed "happy and well-nourished," Kellogg speculated that he had stopped growing and gaining weight before his death.[115]  Based on the numerous ligature marks on his arms and legs, Kellogg surmised that Davontae was

---

109 RR 30 @ 48
110 RR 32 @ 30-34, 37
111 RR 32 @ 49
112 RR 32 @ 63-65
113 RR 32 @ 120-121
114 RR 32 @ 124-125
115 RR 32 @ 118, 127-28

35

restrained or kept from accessing food.[116]   She concluded from the photos of the ligature marks and the autopsy report that the person or people who tied him up were intentionally starving him and ultimately killed him.[117]   Kellogg also opined that an ordinary person would have been able to look at Davontae and know that he needed medical attention.[118]

At the conclusion of Kellogg's testimony, the State rested.[119]   Appellant then moved for an instructed verdict on the capital murder charge, challenging the sufficiency of the evidence to prove intent and kidnapping.[120]   Appellant also contended that the evidence was insufficient to establish that she or Williams caused Davontae's death by failing to provide adequate food or medical care because there was evidence that Davontae was fed and did receive treatment.  Last, Appellant argued that there was no evidence that she or Williams had caused Davontae's death by inflicting physical injury, because the undisputed testimony established that Davontae's injuries were not life-threatening and were not the cause of his death.[121]

Appellant also moved for directed verdict on Count Two, injury to a child. Specifically, she argued that there was no evidence that she was acting in *loco parentis* at

---

116 RR 32 @ 131-32
117 RR 32 @ 135
118 RR 32 @ 138
119 RR 33 @ 6
120 RR 33 @ 12
121 RR 33 @ 13

36

the time of Davontae's death because there was no express or implied consent that she act in the stead of Davontae's mother, and that she had no duty or obligation as a care giver to provide adequate medical care and food.

After the court denied the motion for instructed verdict, Appellant called Lesther Winkler, a pathologist with more than 47 years' experience, who testified that Davontae had not died from malnutrition.[122]   After reviewing the autopsy report, microscopic slides of tissue taken from Davontae's lungs, and other evidence relied on by Konzelmann, Winkler noted that Davontae's right lung was considerably heavier than his left lung because it contained aspirated material that he had sucked in through his airway.[123]   Winkler told the jury that Davontae had died of aspiration pneumonia and that his death was accidental.[124]

Equally significant was Winkler's concurrence with Konzelmann that Davontae's physical injuries were not life-threatening and did not cause his death.[125]   Winkler also noted that although there was evidence of malnutrition, the child had obviously been given food, as evidenced by diarrhea and vomit present on his body and clothes.[126]   In Winkler's opinion, the malnourishment alone would not have caused Davontae's

---

122 RR 34 @ 8
123 RR 34 @ 38-39
124 RR 34 @ 34, 80
125 RR 34 @ 54, 92, 105
126 RR 34 @ 56

37

death.[127]    Winkler was unable to conclude whether Davontae had not been given adequate food or whether his body had simply been unable to metabolize it.[128]  Winkler also pointed out that the creams, pads and ointments found on Davontae's body at the time of his death were evidence that the person or people taking care of him were attempting to treat his wounds.[129]

In rebuttal, the State called Tarrant County Medical Examiner Nizam Peerwani, who testified that he had reviewed Davontae's file and had concluded that the cause of death was malnutrition.[130]  Peerwani said that anyone who had seen Davontae during the last weeks of his life would have known that he needed medical attention.[131]

The jury found Appellant guilty of capital murder and injury to a child.[132]

## B)    Punishment Evidence

At the punishment phase, Appellant pleaded true to the habitual offender notice and the State introduced pen packets to prove that Appellant had final convictions for the felony offenses of burglary of a habitation and possession of a controlled substance with intent to distribute.[133]    The State requested that all the evidence from the guilt-innocence phase be brought forward to the punishment phase and then called Williams' aunt, Tracy

---

127 RR 34 @ 56-57
128 RR 34 @ 83-84, 86
129 RR 34 @ 66
130 RR 34 @ 112, 116
131 RR 34 @ 144
132 CR @ 793
133 RR 35 @ 68-69

38

Binder.[134]   Binder testified that her mother had told Williams that her relationship with Appellant was an "abomination to God" and that she should not raise her child in that type of environment.[135]   Binder said that she wanted Williams and Appellant to be incarcerated for a very long time, but the issue of whether Appellant should receive the death penalty was "up to God."[136]   At the conclusion of Binder's brief testimony, the State rested.[137]

Appellant then put on extensive evidence that she was sexually, mentally, and physically abused by various family members throughout her childhood.[138]   In addition to the evidence of Appellant's traumatic childhood, the defense also introduced medical records indicating that Appellant had been diagnosed as "bipolar disorder – severe depressed with psychotic features."[139]

After the jury retired for deliberations, the foreman sent out three separate notes with a total of ten questions.[140]   The questions addressed a variety of topics, including how parole law would affect Appellant's sentence, what her I.Q. was, and what constituted "mitigating evidence." After each note, the trial court referred the jurors back to the court's charge without additional explanation. Shortly following the trial court's

---

134 RR 35 @ 69-71
135 RR 35 @ 74
136 RR 35 @ 80
137 RR 35 @ 81
138 RR 36 @ 48, 51, 53
139 RR 36 @ 12-13, 209
140 CR @ 806, 808, 811

39

denial of the jury's request to review specific evidence, the jury returned with an affirmative finding on Special Issues No. 1 and 2 as to Appellant's future dangerousness and intent, and a negative finding on Special Issue No. 3, as to the existence of mitigating circumstances that warranted a sentence of life imprisonment rather than the death penalty.[141]    The trial court then sentenced Appellant to death on Count One.  The jury also returned an affirmative finding on the State's deadly weapon allegation and sentenced Appellant to 99 years' confinement on Count Two.

---

141 CR @ 815-17

40

## VIII. AFFIDAVITS AND ATTACHMENTS

Applicant submits the following documents for the Court's consideration that were filed in this case that were included in Applicant's State Court Petition for Writ of Habeas Corpus:

1. Indictment – Exhibit 1 to Applicant's State Court Petition

2. Tonya Coleman Brown Affidavit – Exhibit 2 to Applicant's State Court Petition

3. Sharon Brown Affidavit – Exhibit 3 to Applicant's State Court Petition

4. Marcella Williams Affidavit – Exhibit 4 to Applicant's State Court Petition

5. Motion for Continuance – Exhibit 5 to Applicant's State Court Petition

6. Toni Knox Affidavit – Exhibit 6 to Applicant's State Court Petition

7. ABA Guideline 10.7 – Investigations – Exhibit 7 to Applicant's State Court Petition

8. Guilt/Innocence Jury Charge and Verdict – Exhibit 8 to Applicant's State Court Petition

9. Second Court of Appeals Abatement Order – Exhibit 9 to Applicant's State Court Petition

10. Joint Motion to Abate Appeal – Exhibit 10 to Applicant's State Court Petition

11. Punishment Jury Charge and Verdict – Exhibit 11 to Applicant's State Court Petition

41

## IX. ARGUMENT AND AUTHORITIES

**CLAIM FOR RELIEF NUMBER ONE – RESTATED:**

> APPLICANT'S SIXTH AMENDMENT RIGHT TO COUNSEL
> WAS VIOLATED WHEN SHE RECEIVED INEFFECTIVE
> ASSISTANCE OF COUNSEL AS A RESULT OF HER LEGAL
> TEAM'S FAILURE TO ADEQUATELY INVESTIGATE THE
> FACTS OF THIS CASE AS REQUIRED BY *STRICKLAND V.*
> *WASHINGTON*, 466 U.S. 668 (1984) AND AS REQUIRED BY THE
> SIXTH AND FOURTEENTH AMENDMENTS TO THE U. S.
> CONSTITUTION.

**A.    Legal Bases for Claim**

Under the standards recognized by the court in *Strickland v. Washington,*[142]

Applicant received ineffective assistance of counsel as a result of her legal team's failure

to adequately investigate the facts and circumstances of her case.

A habeas petitioner claiming ineffective assistance of counsel must prove that

counsel's performance was unconstitutionally deficient and that the deficient

performance prejudiced her defense.[143]   "'Counsel's performance is considered deficient

if it falls below an objective standard of reasonableness as measured by professional

norms.'"[144]   This Court "must determine whether there is a gap between what counsel

actually did and what a reasonable attorney would have done under the circumstances."[145]

To establish prejudice, a petitioner must show that there is a reasonable probability

---

142 *Strickland v. Washington*, 466 U.S. 668 (1984).
143 *Id.* at, 687.
144 *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002) (en banc) (quoting *Strickland*).
145 *Id.*

42

that, but for counsels' unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.[146] The relevant query is whether one juror's mind might have been changed had counsel performed adequately.[147] The *Strickland* standard applies in both the guilt/innocence and punishment phases of a trial.[148]

## B.    Facts Supporting Applicant's Claim

Applicant's legal team failed to adequately investigate and present guilt/innocence evidence relevant to the kidnapping allegation contained in the indictment. As a result, Applicant was prevented from presenting a defense to the kidnapping allegation contained in the indictment. Specifically, the facts and circumstances surrounding Applicant's trial and the pre-trial investigation show the following:

a) Applicant's legal team failed to thoroughly investigate the facts and circumstances of Applicant's case when they failed to interview Tonya Coleman Brown.

b) Applicant's legal team failed to thoroughly investigate the facts and circumstances of Applicant's case when they failed to interview Sharon Coleman.

c) Because of these failures, Applicant's legal team was not able to present a defense to present a defense to the 'kidnapping' element of the capital murder charge.

---

146 *Id.* at 391; *See also Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000).
147 *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993).
148 *Strickland*, 466 U.S. at 686-87.

43

These failures resulted in a violation of Applicant's Sixth Amendment Rights to effective assistance of counsel and require that Applicant be given a new trial.

## C. Lack of Thorough Factual Investigation

Applicant received ineffective assistance of counsel because of counsels' failure to conduct an adequate factual investigation and the failure to present an adequate defense to the kidnapping allegation contained in the indictment and necessary to prove a capital murder.  As seen herein,  Applicant has demonstrated that (1) counsels' assistance was outside the range of competence demanded of attorneys in criminal cases, and (2) there is a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different.[149]   Applicant has also shown that there is reasonable probability that is sufficient to undermine confidence in the outcome of here trial.[150]

Counsel has a duty to make reasonable investigations, and " 'a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsels judgments.' "[151] Counsel has a duty to make reasonable pre-trial investigations or to make a reasonable decision that makes particular investigations unnecessary.[152]   While counsel is not required to always

---

149 *Strickland*.
150 *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2052.
151 *Wiggins v. Smith*, 539 U.S. 510, 521-22, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting *Strickland*
152 *Id.* at 521, 123 S.Ct. at 2527.

44

investigate every possible lead or piece of mitigating evidence, especially if it is not likely to positively aid the defendant, counsel should put forth enough investigative effort to base a decision not to present a mitigating case on a thorough understanding of the available evidence. A counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" while "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."[153]

Among counsel's duties is that of making an independent investigation of the facts of the client's case, although its scope may fluctuate under varying circumstances.[154] As part of this duty, counsel has a responsibility to seek out and interview potential witnesses and to present a defense, if one is available. Applicant's trial counsel failed to conduct an independent investigation and failed to seek out and interview potential witnesses and to present a defense.

### *Tonya Coleman Brown and Sharon Coleman*

During the factual investigation conducted in connection with preparing Applicant's state Application for Writ of Habeas Corpus, interviews were conducted with Tonya Coleman Brown and Sharon Coleman, members of Applicants family, and with Marcella Williams, Davontae's mother. The affidavit of Tonya Coleman Brown is

---

153 *Strickland.*
154 *Wiggins,* 539 U.S. at 521, 123 S. Ct. at 2527.

45

attached as Exhibit 2 to Applicant's state writ, and is included herein verbatim.  The

affidavit of Sharon Coleman is attached as Exhibit 3 to Applicant's state writ, and is

included herein verbatim.

Tonya Coleman Brown is a fact witness who has knowledge of relevant facts that

were vital and important to applicant's defense.  Yet, these facts were undiscovered by

Applicant's trial team because they did not interview her.  Indeed, Applicant's trial team

failed to interview Ms. Brown to determine whether she had knowledge of the events

giving rise to this offense.  The facts contained in Ms. Brown's affidavit are as follows:

> "My name is Tonya Coleman Brown.  I reside at 509 S.
> Edgewood Terrace, Apt, 231, Fort Worth, Tarrant County, Texas.
> My date of birth is September 12, 1971.  I have personal knowledge
> of the facts stated herein and they are true and correct.
>
> I am the Aunt of Lisa Ann Coleman.  During the months leading
> up to July 26, 2004, I visited in the home of Lisa Ann Coleman and
> Marcella Williams approximately one or two times a month. When I
> visited with Lisa and Marcella, I constantly saw Davontae Williams
> playing with other children, running around, and acting like a normal
> child.  I never saw Davontae restrained or tied up in any manner
> whatsoever.  In addition, every time I saw Davontae he appeared to
> be in good health.
>
> I was never contacted by Lisa Coleman's lawyers or any other
> person prior to Lisa's trial.  If I had been contacted, I would have
> related these facts to that person and been ready and able to testify to
> the facts stated herein."
>
> Affidavit of Tonya Coleman Brown, Exhibit 2 to Applicant's state
> writ.

Despite this vital and important knowledge, Tonya Coleman Brown was never

46

contacted by Applicant's lawyers, an investigator, or by any other person on Applicant's behalf prior to her trial. If Ms. Brown had been contacted, she would have testified to these facts during Applicant's trial and been able to educate the jury about the homelife of Applicant, Marcella Williams, and Davontae. As a result, this vital and important information was not available to the jury during the guilt/innocence phase of Applicant's trial and, in all likelihood, would have changed the result. Therefore, Applicant did not receive a fair trial because of her attorneys' omissions.

Sharon Coleman is also a fact witness who has knowledge of relevant facts that were vital and important to applicant's defense. Again, these facts were undiscovered by Applicant's trial team because of the failure to interview her. Ms. Coleman is the sister of Lisa Ann Coleman. The facts contained in Ms. Brown's affidavit are as follows:

> "My name is Sharon Coleman. I reside at 509 S. Edgewood Terrace, Apt, 231, Fort Worth, Tarrant County, Texas. My date of birth is August 5, 1986. I have personal knowledge of the facts stated herein and they are true and correct.
>
> I am the sister of Lisa Ann Coleman. During the months leading up to July 26, 2004, I lived about eight apartments away from Lisa Coleman and Marcella Williams and visited in their home on a daily basis. During this time, I constantly saw Davontae Williams playing outside with other children. I also saw Davontae playing outside in various places such as the park and the playground with his sisters and other children from the neighborhood. I constantly saw Devontae running around and acting like a normal child. I would often sit outside my door and watch Davontae play, run around, and act like a normal child. I remember many times that neighbor children would go to Davontae's apartment and he would go outside and play with them. During all the time I spent at the home of Lisa

47

Coleman and Marcella Williams, I never saw Davontae restrained or tied up in any manner whatsoever. In addition, every time I saw Davontae he appeared to be in good health.

I was never contacted by Lisa Coleman's lawyers or any other person prior to Lisa's trial. If I had been contacted, I would have related these facts to that person and been ready and able to testify to the facts stated herein."

Affidavit of Sharon Coleman, Exhibit 3.

Despite this vital and important knowledge, Sharon Coleman was never contacted by Applicant's lawyers, an investigator, or by any other person on her behalf prior to Applicant's trial. If Ms. Coleman had been contacted, she would have testified to these facts during Applicant's trial. As a result, this vital and important information was not available to the jury during the guilt/innocence phase of Applicant's trial and, in all likelihood, the result would have been different. Therefore, Applicant did not receive a fair trial because of her attorneys' omissions.

### 1. Marcella Williams

In addition to the above examples of Applicant's trial attorneys' failure to investigate, Marcella Williams had vital information about the relevant facts of this case. Ms. Williams has provided a sworn declaration concerning facts that are vital and important to Applicant's defense to the kidnapping allegation contained in the indictment. The sworn declaration of Marcella Williams is attached as Exhibit 4 to Applicant's state writ, and is included herein verbatim. The facts contained in Ms. Williams' declaration

48


are as follows:

"My name is Marcella Williams.  My date of birth is February 19, 1981.  I have personal knowledge of the facts stated herein and the are true and correct.  I swear the statements contained herein are true.

"Davontae Williams was my son.  At the time of Davontae's death, I lived in Apt. 26 of the Arbor Apartments in Arlington, Texas, with Davontae, destine, Alisha, Lisa Coleman, and Dontrell Coleman. We all lived at the apartment for 7 – 8 months.

"I found Davontae dead on the morning of July 26, 2004.  When I discovered him, he was still warm and I thought that he had just died.  Davontae was in his bed, alone, when I found him dead.  We, Davontae, Destinee, Alisha, Lisa, and I were all together in the same room but Davontae was sleeping alone in his bed.  Davontae was not restrained or tied up in any way whatsoever while he was sleeping.

"Davontae went to bed about 7:00 p.m. the nite before, July 25, 2004.  When he went to bed that nite, he was not restrained or tied up.

"The day before, July 25, 2004, Davontae was very sick.  He was in and out of the bathroom during the day.  On July 25, 2004, Davontae was restrained for about 10 minutes because he was getting into stuff while we were getting ready.  Sometime during the day on July 25, 2004, all of us, including Davontae, went to Lisa's mother's apartment about 2 buildings down from us for about an hour.  When we were there, Davontae was playing with other children.

"We kept Davontae restrained from time to time from 10 minutes to a couple of hours.  Davontae was never restrained for more than half a day.  Most of the time, Davontae was restrained while we were asleep to keep him from getting into stuff that would hurt him.

"While we lived at the Arbor Apartments, Davontae would constantly go outside and play with his sisters, Dontrell, and other children from the neighborhood.

49

"Davontae would go outside to play with other children as often as 3 to 4 times a week. He would go to the park across the street and play with kids from the neighborhood.

"Neither Lisa nor I ever intended to hide or secrete Davontae from any person. We always let Davontae loose after we restrained him and never restrained him for more than half a day.

"I was Davontae's mother. When he was restrained it was because that was the only way I knew how to keep him out of stuff. Any restraint was done with my permission or at my direction.

"I am signing this declaration under the penalty of perjury. Everything contained herein is true and correct."

Declaration of Marcella Williams, Exhibit 4.

The declaration of Marcella Williams constitutes more evidence that Applicant did not receive a fair trial because the jury did not have a complete picture of the facts of the case.

### 2. The April 26, 2006 Motion for Continuance

On April 26, 2006, Applicant's attorneys filed an "Emergency Supplement to Defendant's Motion to Continue." In this Motion, Applicant's attorneys requested a continuance because, among other reasons, they would not be ready for trial since the factual investigation could not be completed in time for trial. In addition, Applicant's trial attorneys swore that it was necessary to further investigate the facts of this case. This Motion was denied. A true and correct copy of the Emergency Supplement to

50

Defendant's Motion to Continue is attached as Exhibit 5 to Applicant's state writ and incorporated herein by reference as though set out in full.

In this Motion, Applicant's trial attorneys swore that Applicant would be irreparably harmed by the failure to conduct a more thorough factual investigation. As seen by the affidavits of Tonya Coleman Brown and Sharon Coleman, this prediction has turned out to be true. Because of the failure to conduct a more thorough factual investigation as described above, Applicant has received ineffective assistance of counsel and was harmed by the failure to investigate. Since the evidence establishes that no reasonable juror would have convicted Applicant for capital murder in the face of this omitted evidence, there is a reasonable probability that is sufficient to undermine confidence in the outcome of here trial. As a result, this Court should grant this writ, and reverse her conviction.

## SUMMARY OF INEFFECTIVE INVESTIGATION ARGUMENT

It is black letter law that a criminal defense lawyer must have a firm command of the facts of the case as well as governing law before he can render reasonably effective assistance of counsel. A natural consequence of this notion is that counsel has the responsibility to seek out and interview potential witnesses. The failure to interview witnesses is not trial strategy unless and until the trial attorney has conducted the necessary legal and factual investigation which would enable him to make an informed rational decision. Counsel has a duty to bring to bear such skill and knowledge as will

51

render the trial a "reliable adversarial testing process."[155]

The failure of Applicant's defense team to conduct an adequate factual investigation harmed Applicant and resulted in valuable information being unavailable to the jury. The defense team failed to present a complete picture of the alleged 'kidnapping' issue to the jury. Since the jury did not understand the complete picture" of the 'kidnapping' issue, they were easily swayed by the limited evidence available to them when they found Applicant guilty of capital murder based on an incomplete investigation.

In this case, Applicant received ineffective assistance of counsel because her trial attorneys failed to conduct an adequate investigation of the facts of the case. Particularly, Applicant's attorneys failed to investigate the facts and circumstances surrounding the 'kidnapping' allegation contained in the indictment. Without this evidence, Applicant's attorneys were not able to present a defense to the kidnapping allegations contained in the indictment.

There is a reasonable probability that, if this evidence had been presented, the outcome would be different. For example, the evidence supporting the kidnapping element of Applicant's conviction was testimony from CPS Investigators Dieble and Campbell that Applicant told them that Marcella Williams was the person who tied up

---

[155] *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065.

Davontae.[156]    In addition, Applicant's 'statement' indicates that Williams tied up Davontae.[157]   This was the sum and substance of the evidence supporting the kidnapping allegation of Applicant's conviction.   As argued more fully in Claim Three herein, this evidence is totally insufficient, as a matter of law, to support her conviction and the proof gathered during the habeas investigation shows that Applicant is actually innocent of capital murder.

Applicant was prevented from defending against the kidnapping charge because her attorneys failed to adequately investigate the facts surrounding the kidnapping allegation.   If Applicant's attorneys would have presented the testimony of Sharon Coleman, Tonya Coleman Brown, and Marcella Williams the jury would have had evidence to mitigate against the kidnapping allegation and, in a reasonable probability, would have found applicant not guilty of capital murder.   Since the evidence establishes that no reasonable juror would have convicted Applicant, there is a reasonable probability that there is sufficient evidence to undermine confidence in the outcome of her trial. Therefore, this Court should grant this writ, and reverse her conviction.

---

156 RR 30 @ 193
157 RR 30 @ 64-66

53

## APPLICANT'S RIGHT TO A FACTUAL HEARING

Under 28 USC §2254, "[A] federal evidentiary hearing is required unless the state court trier of fact has, after a full hearing reliably found the relevant facts."[158]   There has never been a true fact-finding by a jury as to the extent of the 'kidnapping' evidence.   In addition, the evidence referenced in this Application raises a controverted, previously unresolved factual issue material to the legality of Applicant's confinement, and this Court should conduct an evidentiary hearing on this issue.

---

158 *Townsend v. Sain*, 372 U.S. 293, 312-13, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

**CLAIM FOR RELIEF NUMBER TWO – RESTATED:**

APPLICANT'S SIXTH AMENDMENT RIGHT TO COUNSEL WAS VIOLATED WHEN SHE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AS A RESULT OF HER LEGAL TEAM'S FAILURE TO ADEQUATELY INVESTIGATE AND PRESENT MITIGATION EVIDENCE AS REQUIRED BY *WIGGINS V. SMITH*, (123 S.CT. 2527 (2003) AND *LEWIS V. DRETKE*, 355 F.3D 364 (5TH CIR. 2003) AND AS REQUIRED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U. S. CONSTITUTION.

**A.   Legal Bases for Claim**

Under the standards recognized by the court in *Strickland v. Washington*,[159] Applicant received ineffective assistance of counsel as a result of her legal team's failure to adequately investigate and present mitigation evidence as required by Wiggins *v Smith*,[160] and *Lewis v. Dretke*.[161]

A habeas petitioner claiming ineffective assistance of counsel must prove that counsel's performance was unconstitutionally deficient and that the deficient performance prejudiced her defense.[162]   "'Counsel's performance is considered deficient if it falls below an objective standard of reasonableness as measured by professional

---

159 *Strickland v. Washington*, 466 U.S. 668 (1984)
160 *Wiggins v Smith*, (123 S. Ct. 2527 (2003).
161 *Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003).
162 *Strickland*, 466 U.S. at 687.

55

norms.'"[163]    This Court "must determine whether there is a gap between what counsel actually did and what a reasonable attorney would have done under the circumstances."[164]

To establish prejudice, a petitioner must show that there is a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.[165]    The relevant query is whether one juror's mind might have been changed had counsel performed adequately.[166]

The *Strickland* standard applies in both the guilt/innocence and punishment phases of a trial.[167]    Specifically, the Strickland standard applies to a Defendant's legal team's failure to adequately investigate and present mitigation evidence as required by Wiggins *v Smith*, and *Lewis v. Dretke*.[168]

## B. Facts Supporting Applicant's Claim

Applicant's legal team failed to adequately investigate and present mitigation evidence. Specifically, the facts and circumstances surrounding Applicant's trial and the pre-trial investigation show the following:

    a. Applicant's legal team failed to thoroughly investigate her mitigation evidence.

---

163 *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002) (en banc) (quoting *Strickland*).
164 *Id.*
165 *Id.* at 391; *See also Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000).
166 *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993).
167 *Strickland*, 466 U.S. at 686-87.
168 *Wiggins v Smith*, 123 S. Ct. 2527, 2535 (2003) and *Lewis v. Dretke*, 355 F.3d 364, 366 (5th Cir. 2003).

56

b. The mitigation in the punishment phase was not effectively presented.

These failures resulted in a violation of Applicant's Sixth Amendment Rights to effective assistance of counsel and require that Applicant be given a new punishment trial.

## 1. Lack of Thorough Mitigation Investigation

Applicant's defense team retained Toni Knox as a mitigation specialist for the trial of this case in the 297th District Court.  However, the mitigation investigation was not performed in accordance with the standard accepted and practices in the field.  As a result, Applicant was harmed because her trial team did not have all the facts needed to make decisions about Applicant's trial.  The Affidavit of Toni Knox, LCSW, titled: "Affidavit of Toni Knox" (hereinafter referred to as "Knox Affidavit") is attached as Exhibit 6 to Applicant's State writ and incorporated herein for all purposes.

As stated, Ms. Knox served on Applicant's defense team as a mitigation specialist. As the mitigation specialist, Ms. Knox failed to conduct the mitigation investigation in a reasonable manner and failed to conduct it accordance with the ABA Guidelines concerning mitigation investigations.  A true and correct copy of ABA Guideline 10.7 – Investigations is attached hereto and incorporated herein for all purposes as Exhibit 7.

57

The ABA Guidelines have been accepted as the standard for mitigation investigations in capital cases.[169]

On April 26, 2006, Applicant's attorneys filed an "Emergency Supplement to Defendant's Motion to Continue." In this Motion, Applicant's attorneys requested a continuance for, among other reasons, that they would not be ready for trial because the mitigation investigation could not be completed in time for trial. In addition, Applicant's trial attorneys stated, in this motion, that it was necessary to conduct a thorough mental health evaluation prior to trial. This Motion was denied. A true and correct copy of the Motion to Continue is attached as Exhibit 5 to Applicant's State Writ and incorporated herein by reference as though set out in full.

In this Motion for Continuance, Applicant's trial attorneys swore that Applicant would be irreparably harmed by the failure to conduct a more thorough mitigation investigation. As seen by the affidavit of Toni Knox (Exhibit 6), this prediction has turned out to be true. Because of the failure to conduct a more thorough mitigation investigation, Applicant has received ineffective assistance of counsel and was harmed as a result thereof.

### 2. Neuropsychological testing not obtained

Applicant's trial team failed to obtain any neuropsychological testing on Applicant

---

[169] *Rompilla v. Beard*, 545 U.S. 374, 387, 125 S.Ct. 2456, 2466 (2005); *Wiggins*, 539 U.S. at 520, 123 S.Ct. at 2535, (2003).

even though one of the experts, Dr. Lundberg-Love, (psychologist) recommended it. According to Ms. Knox, it is now apparent that neuropsychological testing should have been performed on Applicant. This failure to perform the neuropsychological testing harmed Applicant and mandates a new punishment trial.

### 3. The mitigation investigation failed to meet the ABA guidelines

The Mitigation investigation by Applicant's defense team violated her right to an effective defense because it failed to meet the ABA Guidelines. Mitigation strategies for capital cases have been developing and changing over the past years based on increased knowledge concerning effective mitigation and recent Supreme Court rulings. As in any evolving field, strategies change based on experience from problems related to certain strategies. This is exemplified by the changing ABA guidelines regarding mitigation in capital cases. As a result of various federal and state court decisions, there have been additional changes in the presentation of mitigation strategy.

The ABA Guidelines require several personal interviews with the accused, the accused's family, and the accused's friends.[170] The mitigation failed to meet the standards of this guideline since there was no neuropsychological testing. As seen herein, this information could have explained Applicant's actions to the jury. The failure to conduct the neuropsychological testing harmed Applicant because the jury was unable

---

170 ABA Guidelines 10.7 – Investigations.

to assess valuable information that is often obtained from this type of testing.

## APPLICANT'S RIGHT TO A FACTUAL HEARING

Under 28 USC §2254, "[A] federal evidentiary hearing is required unless the state court trier of fact has, after a full hearing reliably found the relevant facts."[171]    There has never been a true fact-finding by a jury as to the extent of Applicant's mitigation evidence.    In addition, the evidence referenced in this sworn Application raises a controverted, previously unresolved factual issue material to the legality of Applicant's confinement, and this Court should conduct an evidentiary hearing on this issue.

---

[171] *Townsend v. Sain*, 372 U.S. 293, 312-13, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

60

**CLAIM FOR RELIEF NUMBER THREE – RESTATED:**

APPLICANT HAS BEEN DENIED HER RIGHT TO DUE
PROCESS UNDER THE FIFTH AND FOURTEENTH
AMENDMENTS TO THE U. S. CONSTITUTION AS SHE IS
INCARCERATED AND FACES EXECUTION FOR AN OFFENSE
FOR WHICH SHE IS ACTUALLY INNOCENT.

**A. Governing Law**

In 1995, the U. S. Supreme recognized that the execution of an innocent person is

a violation of the Due Process Clause.[172] Additionally, claims of actual innocence based

upon newly discovered evidence are cognizable on post-conviction writs of habeas

corpus.[173] Applicant has newly discovered evidence that shows she is actually innocent of

the crime of conviction. This evidence is newly discovered since her trial attorneys' did

not discover this evidence because they failed to adequately investigate the 'kidnapping'

facts underlying her conviction.

A *Schlup*[174] innocence claim is one that "does not by itself provide a basis for

relief," but is intertwined with constitutional error that renders a person's conviction

constitutionally invalid.[175] To succeed in an actual innocence claim the applicant must

show "by clear and convincing evidence that, despite the evidence of guilt that supports

---

172 *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).
173 *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993).
174 *Schlup v. Delo*, 513 U.S. at 315, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).
175 *Id.*

61

the conviction, no reasonable juror could have found the applicant guilty in light of the new evidence."[176]  This showing must overcome the presumption that the conviction is valid and it must unquestionably establish applicant's innocence.[177]  Not only must the habeas applicant make a truly persuasive showing of innocence, she must also prove that the evidence he relies upon is "newly discovered" or "newly available."  The term "newly discovered evidence" refers to evidence that was not known to the applicant at the time of trial and could not be known to him even with the exercise of due diligence. He cannot rely upon evidence or facts that were available at the time of his trial, plea, or post-trial motions, such as a motion for new trial.[178]

## B. Application

Here, Applicant has presented affidavits sworn out by Sharon Coleman, Tonya Coleman Brown, and Marcella Williams, stating facts that prove Davontae Williams was not kidnapped.  Such evidence was not available to Applicant for purposes of the time of trial **due to the failure of her attorneys to adequately investigate the facts of the case**. Thus, Applicant has established that the evidence is "newly available."  Moreover, the new discovered evidence establishes by clear and convincing evidence that no reasonable juror could have convicted her of the charged offense of capital murder.

The evidence obtained from Brown, Coleman, and Williams clearly shows that

---

176 *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
177 *Id.*
178 *Id.*

62

Applicant did not commit or attempt to commit a kidnapping. This evidence was not available because Applicant's attorneys failed to adequately investigate the facts of this case as described in Claim No. 1, the ineffective assistance of counsel claim. This new evidence is inexorably intertwined with Applicant's claim of ineffective assistance of trial counsel and mandates a new trial for Applicant.

The evidence from Brown, Coleman, and Williams establishes by clear and convincing evidence that no reasonable juror could have convicted Applicant of the charged offense of capital murder **because there was no kidnapping**.

To have committed the offense of kidnapping, the State had to establish, beyond a reasonable doubt, that Applicant secreted or held Davontae in a place he was not likely to be found, or restrained him by using or threatening to use deadly force.[179] "Deadly force" means force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing death or serious bodily injury.[180] The "restraint" is not unlawful if the victim is younger than 14 years of age and the parent has acquiesced to the restraint.[181]

The evidence supporting the kidnapping element of Applicant's conviction was slim, at best. This evidence included testimony from CPS Investigators Dieble and Campbell that Applicant told them that Marcella Williams was the person who tied up

---

[179] Tex. Penal Code §20.01(2)(A)(2003).
[180] Tex. Penal Code. §9.01(3)(1997).
[181] Tex. Penal Code §20.01(1)(B)(i)(2003).

Davontae.[182]   In addition, Applicant's 'statement' indicates that Williams restrained Davontae by using items of clothing for a short period of time.   However, there was no evidence the clothing was used in a manner that was able to cause serious bodily injury or death.[183]   Simply stated, there is no evidence that deadly force was used to restrain Davontae.

The declaration of Marcella Williams clearly indicates that if Davontae was restrained, the restraint was accomplished with her consent.   Ms. Williams was Davontae's mother and Davontae was under the age of 14.   Thus, Applicant did not restrain Davontae as that term is defined in Article 20.01 of the Texas Penal Code.[184]   As a result, the evidence clearly shows that Applicant is actually innocent of capital murder. Therefore, this Court should grant this writ, and reverse Applicant's conviction.

## APPLICANT'S RIGHT TO A FACTUAL HEARING

Under 28 USC §2254, "[A] federal evidentiary hearing is required unless the state court trier of fact has, after a full hearing reliably found the relevant facts."[185]   There has never been a true fact-finding by a jury as to the extent of the 'kidnapping' evidence.   In addition, the evidence referenced in this sworn Application raises a controverted,

---

182 RR 30 @ 193
183 RR 30 @ 64-66
184 Tex. Penal Code §20.01(1)(B)(i)(2003).
185 *Townsend v. Sain*, 372 U.S. 293, 312-13, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

64

previously unresolved factual issue material to the legality of Applicant's confinement,

and the District Court should conduct an evidentiary hearing on this issue.

65

**CLAIM FOR RELIEF NUMBER FOUR – RESTATED:**

> APPLICANT'S SIXTH AMENDMENT RIGHT TO COUNSEL AS REQUIRED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U. S. CONSTITUTION WAS VIOLATED WHEN SHE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AS A RESULT OF APPELLATE COUNSEL'S FAILURE TO ALLOW HER CONVICTION FOR INJURY TO A CHILD TO BECOME FINAL PRIOR TO HER CONVICTION FOR CAPITAL MURDER BECOMING FINAL.

**A. Procedural facts**

Applicant was indicted for on March 30, 2006, in cause number 1016470R.  Count One of the indictment contained four paragraphs alleging that Applicant had intentionally caused Davontae's death, on or about July 26, 2004, while in the course of committing or attempting to commit the offense of kidnapping, by

> Depriving him of adequate medical care and adequate food, while in the course of committing or attempting to commit the offense of kidnapping,

> Starving him and inflicting physical injury to his body, while in the course of committing or attempting to commit the offense of kidnapping,

> Failing to provide adequate medical care and adequate food at a time when Applicant had assumed care, custody, and control of Davontae, while in the course of committing or attempting to commit the offense of kidnapping, or,

> By a manner and means unknown to the grand jury, while in the course of committing or attempting to commit the offense of kidnapping.

Count Two of the indictment charged Applicant with the offense of Injury to a Child, on or about July 26, 2004, by

66

Causing serious bodily injury to Davontae by knowingly failing to provide him with adequate medical care and adequate food at a time when Applicant had assumed care, custody, and control of Davontae,

Causing serious bodily injury by omission to Davontae by knowingly failing to provide him with adequate medical care and adequate food at a time when Applicant had a legal duty to act because she was acting *in loco parentis* with the implied consent of Davontae's mother, or,

Causing serious bodily injury by omission to Davontae by knowingly failing to provide him with adequate medical care and adequate food as a party to the offense.

The offenses were tried together for all purposes. Jury selection began for these combined trials on April 26, 2006, and the combined trials began with opening statements on June 7, 2006.

Applicant was convicted of the murder of Davontae Williams committed during his kidnapping or attempted kidnapping (count one of the indictment) on June 19, 2006, and Applicant was convicted of Injury to a Child (count two of the indictment) arising out of the identical events which led to her capital murder conviction. On June 21, 2006, the jury returned affirmative answers to the special issues presented, and Applicant was accordingly sentenced to death for capital murder. On that same day, the jury also sentenced Applicant to ninety-nine (99) years in prison for the offense of injury to a child. A true and correct copy of the Jury Verdict for each count is attached as Exhibit 8 to Applicant's state writ.

Applicant's conviction for Injury to a child was appealed to the Second Court of

67

Appeals sitting in Fort Worth, Texas.   The appeal of Applicant's Injury to a Child conviction was abated by the Second Court of Appeals on May 17, 2007 (Exhibit 9) at the joint request of Applicant's appellate attorney and the State. (Exhibit 10).

## B.  Facts which give rise to double jeopardy claim

Applicant's conviction for the offense of the injury to a child would have become final prior to her conviction for capital murder **IF** her conviction for the Injury to a Child offense had not been appealed to the Second Court of Appeals in Fort Worth and allowed to become final.   In such event, Applicant's capital murder conviction would have been barred by the application of the prohibition against double jeopardy.   The offenses of capital murder and injury to a child charged against Applicant in the indictment cause number 1016470R, and for which she was twice prosecuted, arise out of one and the same transaction, offense, act, incident, and occurred during the same criminal episode, and not another or different transaction, offense or criminal episode.   The jury charge for the guilt or innocence phase of the combined trials, Exhibit 11, evidences the offenses arose out of identical facts.

## C. Waiver

Applicant has not waived double jeopardy guarantees because those rights do not involve an issue of factual guilt.[186]   The right to freedom from double jeopardy is too

---

[186] *Menna v. New York*, 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975).

68

valuable to be lost to inertia within the criminal justice system. The "underlying idea [behind double jeopardy] ... is that the State with all its resources and power should not be allowed to make repeated attempts to convict [and punish] an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity ...."[187]

## D. Argument and Authorities

The judgment of conviction and sentence for Injury to a Child in cause number 1016470R would have become final prior to her capital murder conviction **IF** her conviction for the Injury to a Child offense had not been appealed to the Second Court of Appeals in Fort Worth while the appeal for her capital murder conviction was pending. Applicant's judgment of conviction and sentence for capital murder in cause number 1016470R, would have been barred by double jeopardy considerations. This has resulted in harm to Applicant because she is facing execution.

In *Ex parte Nielsen*,[188] the Supreme Court made the following comment regarding the extended" protection afforded by the second guarantee of double jeopardy protection which is not encompassed by *Blockburger*:

> "[A] person [who] has been tried and convicted for a crime which has various incidents included in it ... cannot be a

---

187 *Green v. U.S.*, 355 U.S. 184, 187-188, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957).
188 *Ex parte Nielsen*, 131 U.S. 176, 9 S.Ct. 672, U.S. (1889).

second time tried for one of the incidents without being twice put in jeopardy for the same offense."[189]

In *Harris v. Oklahoma*,[190] the Court said:

"[A] person [who] has been tried and convicted for a crime which has various incidents included in it, . . . cannot be a second time tried for one of those incidents without being twice put in jeopardy for the same offense."[191]

The Supreme Court further elaborated on this principle in *Brown v. Ohio*,[192] wherein the Court stated:

"The *Blockburger* test is not the only standard for determining whether successive prosecutions impermissibly involve the same offense. Even if two offenses are sufficiently different to permit the imposition of consecutive sentences, successive prosecutions will be barred in some circumstances where the second prosecution requires the relitigation of factual issues already resolved by the first. [193]

Given the Supreme Court's holding in *re Nielsen*, along with the above marginal note in *Brown v. Ohio*, the term "same offense" as used in relation to the second guarantee of double jeopardy protection cannot be determined by applying the meaning of the term "same offense" as used in relation to the third guarantee of double jeopardy protection. If two statutory offenses are "the same" under the *Blockburger* test, the two offenses would be "the same" when applied to the second guarantee of double jeopardy

_____

189 *Id.* at 676
190 *Harris v. Oklahoma, supra*, 433 U.S. 682, 97 S.Ct. 2912, 2913, 53 L.Ed.2d 1054 (1977).
191 *In re Nielsen, supra*, 131 U.S., at 188, 9 S.Ct., at 676.
192 *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221 (1977).
193 *Id.*, 432 U.S. at 167 n. 6, 97 S.Ct. at 2226 n. 6.

protection.[194]    However, the converse is not true; and, when two offenses are not "same" under the *Blockburger* test, they may be "the same" or be deemed "the same" under application of *In re Nielsen*.  It thus appears that, where *Blockburger* focuses upon the statutory elements of the two offenses, *In re Nielsen* and *Brown v. Ohio* focus upon the factual issues already resolved by the first trial.  Obviously cases involving the second guarantee of double jeopardy protection require a different analysis than those involving the third guarantee of double jeopardy protection.

By creatively choosing which elements it hoped to prove by the same evidence, the State was able to convict appellant for two aggravated offenses in two prosecutions, wherein the aggravated offense in two prosecutions, wherein the aggravating element for each offense was the other offense.  Had appellant been convicted for attempted murder and aggravated kidnapping, instead of attempted capital murder and aggravated kidnapping, our consideration might have been different, but we need not address at this time whether those offenses should be tried in one prosecution.

Describing the offense of capital murder the Texas Penal Code reads:

(a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and: ...

    (2)    the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, or arson;....

---

[194] *Sanabria v. United States*, 437 U.S. 54, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978).

71

The  double jeopardy Clause of the U. S, Constitution would also have barred the sentence of Applicant for the criminal offense of capital murder charged in cause number from becoming final if Applicant's Appellate attorney had not appealed her conviction for Injury to a Child.

In comparing Counts 1 and 2 of indictment in this case, they are in all things identical except for the allegation in Count 1 that Applicant caused the death of Devontae Williams.  In other words, their alleged facts were identical but for the allegation that Applicant caused the death of Devontae Williams **whose death was allegedly caused during the course of committing the acts described above**.

Generally speaking, the principle of double jeopardy serves three distinct interests, with each interest having equal importance:  (a) an interest in finality; (b) an interest in avoiding double punishment; and (c) an interest in allowing the system to acquit against the evidence.  All but the third interest is implicated in this cause.

The United States Constitution and the Texas Constitution provide that no person shall be put in jeopardy of life or liberty twice for the same offense The Fifth Amendment protection against double jeopardy prohibits a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple

72

punishment for the same offense.[195]

It is settled that the second double jeopardy protection forbids successive prosecution for the same offense after conviction.[196] Double jeopardy protections forbid successive prosecutions for greater and lesser included offenses, offenses which are the "same" or which require relitigation of issues previously tried.[197] It is for the sentencing court to exercise its discretion to vacate one of the underlying convictions.

The assumption underlying the *Blockburger* rule is that Congress ordinarily does not intend to punish the same offense under two different statutes.[198]   In *Bell v. U.S.*,[199] the Court said: "Once more it becomes necessary to determine 'What Congress has made the allowable unit of prosecution,' ..., under a statute which does not explicitly give the answer." There, the defendant received consecutive sentences after he pleaded guilty to violations of the Mann Act laid in two counts, each referring to a different woman whom he transported in a single act in the same trip and the same vehicle in interstate commerce for the purpose of prostitution.   In confronting the propriety of that cumulative sentencing, the Court resolved the issue for purposes of punishment of whether the defendant committed only one offense or whether he committed two separate offenses.

---

195 *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969); *Benton v. Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969).
196 *Illinois v. Vitale*, 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980).
197 *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977); *Illinois v. Vitale*, 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980); *Blockburger v. U.S.*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed.2d 306 (1932).
198 *Missouri v. Hunter*, 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983).
199 *Bell v. U.S.*, 439 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955).

73

In holding that for purposes of punishment only one offense had been committed, the Court concluded:

> It merely means that if Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses, when we have no more to go on that the present case furnishes.

Thus, implicit in *Bell* is the holding that although there might be multiple "victims" of a defendant's single behavioral act of criminal misconduct, for double jeopardy purposes, such is or should be irrelevant and immaterial.

The concept of double jeopardy applies to the prosecution for violating a single statutory offense through the use of a single act of completed or attempted robbery that represents criminal misconduct. For purposes of double jeopardy analysis, attention must be focused not on the result of what happened but on the commission of the offense and the only one distinct statutory provision allegedly twice violated by applicant. For purposes of both Double Jeopardy Clauses, the simultaneous prosecution in this case "incidents of the same offense or for the same offense" as the first offense that was being prosecuted in this case, the first statutory offense and the second statutory offense are violations of the same criminal statute that occurred through one single act of criminal misconduct. The jury's conviction and assessment of sentence in this case was constitutionally barred because that conviction and sentence were the retrial of "various incidents" of the requisite statutory and alleged elements of the offense which had been

74

previously litigated during the same jury trial which resulted in the final judgment of conviction and sentence for capital murder.

In *Whalen v. U.S.*,[200] contending the imposition of cumulative punishments was contrary to federal statutory and constitutional law, the defendant appealed after a single jury trial and its resulting separate convictions of rape and the unintentionally killing the same victim in perpetration of rape. Noting the Fifth Amendment guarantee against double jeopardy protects not only against a second trial for the same offense, but also "against multiple punishments for the same offense," the Court said: A conviction for killing in the course of a rape cannot be had without proving all the elements of the offense of rape."[201] Under the *Blockburger* rule, in the present case, however, proof of rape is a necessary element of proof of the felony murder statute allegedly violated, and this case should be treated no differently from other cases in which one criminal offense requires proof of every element of another offense. The Court held that defendant's due process right to be deprived of liberty only upon criminal sentences authorized by Congress, had been violated in the imposition of consecutive sentences since for purposes of imposing cumulative sentences, the Congress intended rape to be a lesser offense included within the offense of killing in the course of rape and thereby precluded the trial court from imposing consecutive sentences in defendant's factual scenario.

---

200 *Whalen v. U.S.*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980).
201 *Id.*, at 1439.

75

## E. Proper Relief and Remedy

In this case, the proper remedy is to vacate the trial court's judgment, and to dismiss Applicant's capital murder conviction.

## CLAIM FOR RELIEF NUMBER FIVE – RESTATED:

**APPLICANT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO BE FREE FROM A WHOLLY ARBITRARY DEPRIVATION OF LIBERTY AND EIGHTH AMENDMENT RIGHT TO BE FREE FROM THE ARBITRARY AND CAPRICIOUS INFLICTION OF THE DEATH PENALTY WERE VIOLATED BECAUSE THE EVIDENCE ADDUCED AT TRIAL WAS LEGALLY INSUFFICIENT TO SUPPORT THE JURY'S ANSWER TO THE FUTURE DANGEROUSNESS SPECIAL ISSUE.**

## A)      LEGAL BASES FOR CLAIM.

The Due Process Guarantee of the Fourteenth Amendment protects criminal defendants from wholly arbitrary deprivations of liberty.[202]    Further, the Eighth Amendment protects defendants from the arbitrary and capricious imposition of the death penalty.[203]   Consequently, to support a death sentence, the State must present evidence establishing beyond a reasonable doubt that the answer to the future dangerousness special issue is "yes."[204]

The proper standard for determining whether the evidence satisfies the burden of proving the issue beyond a reasonable doubt is the familiar "rational fact finder" test established in *Jackson v. Virginia*,[205] Thus, this Court should view the evidence in the

---

[202] *Lewis v. Jeffers*, 497 U.S. 764, 782 (1990).
[203] *Id.*
[204] *Flores v. Johnson*, 210 F.3d 456, 469 (5th Cir. 2000) (Emilio Garza, J., specially concurring) (recognizing that "future dangerousness, like any other element of the crime, must be proven beyond a reasonable doubt").
[205] *Jackson v. Virginia*, 443 U.S. 307, 323 (1979); *Martinez v. Johnson*, 255 F.3d 229, 243-44 (5th Cir. 2001).

77

light most favorable to the verdict and determine whether a rational juror could have answered the future dangerousness issue in the affirmative.

### B)     FACTS SUPPORTING THE CLAIM.

Pursuant to the mandatory dictates of Article 37.071 of the Texas Code of Criminal Procedure, the trial court submitted the following Special Issue to the jury at punishment:

> SPECIAL ISSUE NUMBER 1:  Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society . . . .[206]

In the instant case, the jury answered this issue "Yes."[207]  Applicant respectfully contends that no reasonable juror could have answered this issue in the affirmative.

The evidence relied on to support the jury's finding of future dangerousness consisted of the facts of the indicted crime and the facts of the extraneous offense. Admittedly, the circumstances of the underlying offense alone may be sufficient to support a jury's affirmative answer to the issue on future dangerousness.  However, when all of the evidence is considered, no rational juror would find a probability that Applicant will commit future crimes of violence to be a continuing threat to society.  Consequently, this Court should hold that the evidence is insufficient to support the jury's finding on

_____

206 Tex. Code Crim. Proc. art. 37.071, § 2(b)(1) (2002).
207 8 C.R. 1499

78

Special Issue Number One, vacate Applicant's death sentence, and reform the judgment

to reflect a sentence of life in prison.

## CLAIM FOR RELIEF NUMBER SIX – RESTATED:

APPLICANT'S FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS AND EIGHTH AMENDMENT RIGHT TO BE FREE FROM THE ARBITRARY AND CAPRICIOUS INFLICTION OF THE DEATH PENALTY WERE VIOLATED BECAUSE THE STATUTE UNDER WHICH APPLICANT WAS SENTENCED TO DEATH ALLOWS THE JURY TOO MUCH DISCRETION TO DETERMINE WHO SHOULD LIVE AND WHO SHOULD DIE AND BECAUSE IT LACKS THE MINIMAL STANDARDS AND GUIDANCE NECESSARY FOR THE JURY TO AVOID THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY.

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."[208]   The ban on cruel and unusual punishments is applicable to the States via the due process clause of the Fourteenth Amendment.[209]

The fundamental respect for humanity underlying the Eighth Amendment requires that consideration of the character and record of the individual offender and the circumstances of the particular offense are constitutionally indispensable parts of the process of inflicting the death penalty.[210]   Unfortunately, the evolution of the death penalty has come full circle because, under the present Texas statute applied to Applicant, the jury has again been given unfettered discretion that both invites and permits arbitrary application of the ultimate penalty.[211]

---

208 U.S. Const. Amend VIII.
209 U.S. Const. Amend XIV; *Robinson v. California*, 370 U.S. 660, 675 (1962).
210 *Woodson v. North Carolina*, 428 U.S. 280, 304-05 (1976).
211 *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (plurality op.) ("*Furman v. Geogia*, 408 U.S. 238 (1972) mandates

80

The Texas Legislature reacted to *Penry I*[212] by amending article 37.071 to include a mitigation instruction.[213]  This instruction in effect allows the jury to impose a life sentence if, in their sole discretion, they choose to do so.[214]

As Justice Blackmun noted in his dissent to the denial of certiorari in *Callins v. Collins*, to comply with the mandates of the Eighth Amendment, the death penalty must be fairly administered with reasonable consistency.[215]  In its current formulation, the Texas scheme does not insure such a reasonably consistent application of the ultimate penalty.  Therefore, the statute should be found unconstitutional.

The very nature of the mitigation special issue allows the jury to decide, without any guidance, who should live and who should die.  The mitigation special issue allows juries to decide what, if anything, is "mitigation" and to completely disregard any such mitigation evidence if they so choose.  Thus, the instruction allows juries to kill a defendant simply because they are afraid of a person who is different, whether that difference is race,[216] unsightliness, mental illness, or a difference relating to a host of

---

that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.").

212  *Penry v. Lynaugh*, 492 U.S. 302, 322-28 (1989).

213  Tex. Code Crim. Proc. art. 37.071 § 2(e)(1) (2002).

214  *id.*

215  *Callins v. Collins*, 114 S. Ct. 1127, 1129 (1994) (mem.) (Blackmun, J., dissenting).

216  James Kimberly et al., More Racial Testimony Found in Capital Cases, Hous. Chron., June 9, 2000, at A1 (discussing testimony of expert asserting race as factor that contributes to future dangerousness that caused the U.S. Supreme Court to overturn a Texas death penalty sentence); *Saldano v. Texas*, 530 U.S. 1212 (2000) (mem.).

other improper considerations.  The arbitrariness and capriciousness that results from this
unfettered discretion renders the present scheme unconstitutional.[217]

Under these circumstances, this Court should declare the statutory scheme under
which Applicant was convicted and sentenced to death unconstitutional in violation of the
Eighth Amendment and vacate his death sentence.

---

217 *Gregg v. Georgia*, 428 U.S. at 189.

## CLAIM FOR RELIEF NUMBER SEVEN - RESTATED:

APPLICANT'S FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS AND EIGHTH AMENDMENT RIGHTS AS INTERPRETED IN *PENRY V. JOHNSON* WERE VIOLATED BECAUSE THE MITIGATION SPECIAL ISSUE SET FORTH IN THE TEXAS DEATH PENALTY STATUTE SENDS MIXED SIGNALS TO THE JURY THEREBY RENDERING ANY VERDICT REACHED IN RESPONSE TO THAT SPECIAL ISSUE INTOLERABLY UNRELIABLE.

This Court should hold that the Texas death penalty scheme violates the Eighth Amendment under the Supreme Court's recent decision in *Penry v. Johnson*.[218] While the opinion in that case only repudiated a judicially-crafted mitigation instruction, the statutory mitigation special issue given in Applicant's case is similarly vulnerable to the criticism that it sends "mixed signals" to the jury.

In *Penry II*, the Supreme Court addressed a judicially-crafted response to the defect in Texas law identified in *Penry v. Lynaugh*.[219] In *Penry I*, the Supreme Court held that the then-existing statutory special issues did not provide an adequate mechanism for the jury to give effect to mitigating factors, which could justify the assessment of a life sentence rather than the death penalty.[220] The original concept in *Penry I* was that the statutory instructions were inadequate, even if mitigating evidence might fit within a

---

218 *Penry v. Johnson*, 121 S. Ct. 1910 (2001) (hereinafter "*Penry II*").
219 *Penry v. Lynaugh*, 492 U.S. 302 (1989) (hereinafter "*Penry I*").
220 *Penry I*, 492 U.S. at 322-28.

83

statutory special issue, if the introduction of such evidence was a "two-edged sword," *i.e.* if the evidence could also have aggravating effect.[221]

In *Penry II*, a supplemental instruction was given that basically told the jury that it should show its finding of sufficient mitigating evidence by converting what otherwise would be a "Yes" answer to one of the special issues into a "No" answer.[222] This method was deemed a "nullification instruction" because the answer which otherwise would fit a special-issue question would be "nullified" for the sake of giving effect to mitigating evidence.[223]

The Court began by holding that the "nullification" technique was "confusing" because the instructions, taken as a whole, were susceptible to two different readings by the jury.[224] The first possibility was that the jurors might understand the instruction as requiring them to "take Penry's mitigating evidence into account in determining their truthful answers to each special issue."[225] If so, however, "the supplemental instruction placed the jury in no better position than the jury in *Penry I*."[226] This was because "none

---

221 *Id.* at 323-24.
222 *Id.* at 1921-22.
223 *Id.*
224 *Id.*
225 *Id.* at 1921.
226 *Id.*

84

of the special issues are broad enough to provide a vehicle for the jury to give mitigating effect to the evidence of Penry's mental retardation and childhood abuse.[227]

The Court then went on to consider the possibility that the jury understood the supplemental instruction as a "nullification instruction."[228]  If so, the Court held, "it made the jury charge as a whole internally contradictory, and placed law-abiding jurors in an impossible situation."[229]  The Court specifically referred to the fact that jurors took an oath to render a "true verdict" under article 35.22, Texas Code of Criminal Procedure,[230] and "nullifying" for the sake of mitigation would violate the oath.[231]  The Court found that there was at least a "reasonable likelihood" that jurors who believed in their oath would not follow the "nullification instruction."[232]  Even when the explanatory role of attorneys' argument was taken into account, the majority opinion held that "at best, the jury received mixed signals."[233]

Thus, the rationale of *Penry II* is the finding that the charge sent the jury "mixed signals," even when the full charge and the trial context were considered.   This rationale

---

227  *Id.* (citing *Penry I*, 492 U.S. at 322-25).
228  *Penry* II, 121 S. Ct. at 1921-22.
229  *Id.*
230   Tex. Code Crim. Proc. art. 35.22 (1989) (jurors to be administered oath swearing "you will a true verdict render").
231  *Penry II*, 121 S. Ct. at 1922.
232  *Id.*
233  *Id.* at 1923.

85

went to the heart of the "reliability" issue, which, as noted in *Penry II*, underlay the original holding in *Penry I*.[234]

The question here then becomes whether the statutory "mitigation" issue submitted to the jury in this case also suffers from the constitutional flaw of sending "mixed signals."   To pose the question is to answer it, for this Court has already acknowledged that the statutory issue is unclear as to the burden of proof.[235]

Because the mitigation special issue submitted to the jury pursuant to the dictates of article 37.071 sent "mixed signals" to the jury, that statute is unconstitutional in violation of the Eighth Amendment as interpreted in *Penry II*.   Consequently, Applicant's conviction was secured in violation of his right to Eighth Amendment rights as applicable via the due process clause of the Fourteenth Amendment.   Therefore, this Court should reverse Applicant's conviction and sentence, and remand this cause to the trial court.

## VII. CONCLUSION

Applicant is entitled to habeas corpus relief based upon the facts and legal arguments set forth in the individual claims in this Application.

---

[234] *Penry II*, 121 S. Ct. at 1920-1921.
[235] *Lawton v. State*, 913 S.W.2d 542, 557 (Tex. Crim. App. 1995), (*cert. denied*, 519 U.S. 826) (1996).

86

WHEREFORE, PREMISES CONSIDERED, the Applicant prays that this Court will issue the Writ of Habeas Corpus, and after a full and fair hearing grant relief to Applicant and Order Applicant discharged from the illegal restraint under which he is currently bound.

Respectfully submitted,

Stickels & Associates, P.C.
P. O. Box 121431
Arlington, Texas 76012
Phone: (817) 479 - 9282
Fax: (817) 622 - 8071

BY: _____
John W. Stickels
State Bar No. 19225300
Attorney for Lisa Ann Coleman

87

**CERTIFICATE OF SERVICE**

I certify that on 23rd day of September, 2011, I served a copy of the foregoing on:

Stephen M. Hoffman
The Office of the Texas Attorney General
Postconviction Litigation Division
P. O. Box 12548
Austin, Texas 78711-2548

and

Ms. Lisa Coleman
TDC #00999511
Mountain View Unit
2305 Ransom Road
Gatesville, TX 76528

_____
Attorney for Petitioner

88