**ORIGINAL**

FILED
NORTHERN DISTRICT OF TEXAS
DEC 2 2 2011
CLERK, U.S. DISTRICT COURT
By _____
        Deputy

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| LISA ANN COLEMAN, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CASE NO. 4:11-CV-00542-A |
| | § | **CAPITAL LITIGANT** |
| RICK THALER, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT'S ANSWER WITH BRIEF IN SUPPORT

Petitioner, Lisa Ann Coleman, was properly convicted and sentenced to die

for the murder of her lover's nine-year-old son while committing or attempting

to commit kidnapping. She now challenges her presumptively valid conviction

and sentence in this Court pursuant to 28 U.S.C. §§ 2241 & 2254. For the

reasons discussed below, Coleman fails to demonstrate that she is entitled to

federal habeas relief.

## COLEMAN'S ALLEGATIONS

The Director understands Coleman to allege the following grounds for

federal habeas relief:

1.  She was denied constitutionally effective assistance because
    her trial counsel (a) failed to meaningfully investigate the
    facts of the case by interviewing various witnesses in order to
    rebut the kidnapping element of the capital murder charge;
    and (b)  failed to conduct an adequate investigation into, or

effectively present, mitigation evidence. (Petition at 6; Pet. Memo at 42-60)[1]

2.      She was denied constitutionally effective assistance because her appellate counsel failed to allow Coleman's conviction for injury to a child to become final prior to her conviction for capital murder becoming final. (Petition at 7; Pet. Memo at 66-76)

3.      She was denied due process because she was convicted of a crime for which she is actually innocent. (Petition at 7; Pet. Memo at 61-65)

4.      Her rights under the Eighth and Fourteenth Amendments were violated because there was insufficient evidence to support the jury's answer to the future dangerousness special issue. (Pet. Memo at 77-79)

5.      Her rights under the Eighth and Fourteenth Amendments were violated because Texas's mitigation instruction provides the jury with too much discretion in imposing the death penalty. (Pet. Memo at 80-82)

6.      Her rights under the Eighth and Fourteenth Amendments were violated because Texas's mitigation instruction sends the jury mixed signals. (Pet. Memo at 83-86)

As demonstrated below, Coleman has not established the state courts were objectively unreasonable in their rejection of these claims. Moreover, claims 4-6 outlined above are procedurally barred from federal habeas review. In any

---

[1]      Coleman filed her federal petition on September 23, 2011. On October 3, 2011, Coleman filed an Amended Petition raising the same claims presented in her original petition. The Director will cite to Coleman's claims by citing to the pages of the Amended Petition. Coleman also filed along with her federal petition a memorandum in support of the petition to which the Director will cite as "Pet. Memo."

event, all of the claims are without merit.[2] The Director denies all allegations of fact made by Coleman, except those supported by the record and those specifically admitted herein.[3]

## STATEMENT OF THE CASE

Having been indicted on charges of capital murder, Coleman was convicted and sentenced to death for the murder of her lover's nine-year-old son. CR 9, 790-91, 798-800, 815-20; 35 RR 62; 37 RR 158.[4] The Court of Criminal Appeals

---

[2]     Coleman also presents a separate argument that AEDPA deference should not apply because the statute is unconstitutional as a violation of the separation of powers between Congress and the judiciary. Pet. Memo at 6-12. The Fifth Circuit has already held that AEDPA does not violate the separation of powers doctrine. *Rivas v. Thaler*, 432 Fed. Appx. 395, 406-07 (5th Cir. 2011)(unpublished); *Dufrene v. Brazoria County DA Office*, 146 Fed. Appx. 715, 717 (5th Cir. 2005); *see also Corwin v. Johnson*, 150 F.3d 467, 472 (5th Cir. 1998) and *Hughes v. Johnson*, 191 F.3d 607, 612 (5th Cir. 1999)). In *Plaut v. Spendthrift Farm, Inc.*, the Supreme Court made clear that three actions by Congress can offend the separation of powers doctrine: (1) when Congress creates a statute that was said "[to] prescribe rules of decision to the Judicial Department of the government in cases pending before it;" (2) Congress cannot vest review of the decisions of Article III courts in officials of the Executive Branch; and (3) Congress cannot retroactively command the federal courts to reopen final judgments. 514 U.S. 211, 218-19 (1995). Because none of these situations apply to AEDPA's mandated standard of review, Coleman cannot show that AEDPA violates the separation of powers doctrine. *See also Felker v. Turpin*, 518 U.S. 651, 663-64 (1996) (declining to hold that the restrictions imposed in 28 U.S.C. § 2244 limit the Supreme Court with respect to its original jurisdiction for the Great Writ); *Turner v. Johnson*, 177 F.3d 390, 392-93 (5th Cir. 1999) (judgments about the proper scope of the writ are "normally for Congress to make.") (internal quotation and citation omitted).

[3]     Copies of Coleman's state court records have been previously filed with the Court.

[4]     "CR" refers to the "Clerk's Record," the transcript of pleadings and documents filed in the trial court, followed by the internal page number(s). "RR" refers to the "Reporter's Record," the state record of transcribed trial and punishment

upheld Coleman's conviction and death sentence. *Coleman v. State*, No. 75,478 (Tex. Crim. App. 2009), *cert. denied*, 131 S.Ct. 77 (2010). The Court of Criminal Appeals denied Coleman's state habeas application based on the trial court's findings of fact and conclusions of law. *Ex parte Coleman*, No. 72,094-01 (Tex. Crim. App. August 25, 2010)(unpublished order); SHCR-01 at 258-73, 283; Supp. SHCR-01 at 27-30, 37.[5]

## STATEMENT OF FACTS

### I.  The Facts of the Crime

The Court of Criminal Appeals summarized the facts of the crime as follows:

> On July 26, 2004, Marcella Williams, Coleman's lover, found her nine-year-old son Davontae unconscious and called 911. While en route to Williams's apartment, firefighter and paramedic Troy Brooks stated that the dispatcher changed the call from "breathing difficulty" to "full arrest." When he arrived, Davontae was lying on the bathroom floor clad in a disposable diaper. Brooks testified that Davontae appeared "emaciated" and looked as if he was only three to five years old. Brooks immediately realized that Davontae was dead; his body was already in full rigor mortis, which usually occurs several hours after death. This "shock[ed]" Brooks because Williams

---

proceedings, preceded by the volume number and followed by the internal page number(s). "SX" and "DX" refer to the State's exhibits and the defense's exhibits, respectively, admitted during the trial.

[5]    "SCHR" refers to the Clerk's Record of pleadings and documents filed with the state habeas court. *See generally Ex parte Coleman*, App. No. 72,094-01. "Supp. SHCR" refers to the Supplemental Clerk's Record of pleadings and documents filed with the state habeas court following the Court of Criminal Appeals's March 31, 2010, remand to the state trial court.

had told him that Davontae had just eaten and thrown up and that Williams and Coleman had been washing him. Brooks also noticed that Davontae had a few "dirty bandages" on his arms. Vanessa Sheriff, a paramedic, testified that Williams told her that she tried to feed Davontae Pediasure. Williams also said that Davontae was breathing when she called 911. Sheriff believed this statement "did not match with what [she saw] on the bathroom floor." Both Brooks and Sheriff noticed that Davontae had traces of yellow vomit or bile around his mouth and nose. Sheriff believed that the appearance of vomit was consistent with the liquid Pediasure.

Dr. Daniel Konzelmann conducted the autopsy. Dr. Konzelmann determined that Davontae's death was a homicide and that the direct cause of death was malnutrition coupled with slight pneumonia. Davontae weighed less than forty pounds at the time of his death. Dr. Konzelmann determined that Davontae was malnourished because Davontae's body lacked subcutaneous fat cells. He also cited the lack of fat cells surrounding Davontae's heart as very unusual. Dr. Konzelmann also explained how the external injuries to Davontae's body contributed to his death:

> I believe that some of these injuries were infected and that it's possible that this did relate to the pneumonia that he had. Also some of these were evidence to me that he had been bound and that this would have prevented him from either seeking care on his own or getting food on his own.

> ...

> Malnutrition will depress the immune system. That is, there are cells in the body that are designed to recognize invaders and deal with them, and that takes energy. As someone becomes more malnourished, their system is less able to protect themselves.

Dr. Konzelmann noted evidence indicating that Davontae had been continuously bound. Davontae had numerous linear marks on his wrists. Some of the marks were scarred, indicating wounds that had healed, and some of the marks were "giant sores[s]," indicating that

they were not healing. This demonstrated a pattern of restraint. Davontae's ankles had similar markings. Davontae's ear had a significant wound that was beginning to heal. His lower lip had an ulceration and a tear that would make it hard for Davontae to eat and drink. It appeared that Davontae had chicken-noodle soup before he died but, according to Dr. Konzelmann, "it was inadequate, too late, and possibly too much."

Dr. Nancy Kellogg, a board-certified pediatrician and specialist in child abuse, identified at least 250 distinct injuries to Davontae, including cigarette or cigar burn wounds and numerous ligature marks on his arms and legs. Kellogg described the starvation of a child as "very rare" and "unusual." However, based on the ligature marks, she concluded that Davontae was intentionally starved to death. Davontae had been restrained from accessing food. Based on a review of Davontae's medical records from December 2002, Dr. Kellogg opined that Davontae had a "normal growth velocity" for a child his age. This indicated that he did not suffer from a disease that would stunt his growth. In the months before his death, however, Davontae's weight spiked downward and he stopped growing. The physical stress caused Davontae's hair growth to be abnormal; he had hair growing in places where hair does not normally grow. Such growth is typically seen in people who are anorexic.

Detective Jim Ford questioned Coleman while investigating Davontae's death. Coleman told Detective Ford that she lived with Williams about half of the time and with her son and mother the other half. She used to beat Davontae with a belt but stopped in February or March of 2004 because the beatings left welts. She stated that she and Williams tied up Davontae on several occasions. Recalling the night that Davontae died, Coleman stated that Williams woke her up screaming. Williams attempted to administer CPR to Davontae, and Coleman said that she put Davontae in a warm bath to revive him. Coleman did not know how Davontae injured his arms and legs.

Davontae's sister, [D.W.][6], who was eight at the time, testified that Coleman would tie Davontae up with an extension cord in the bathroom. When Davontae was tied up, he "couldn't move around much" and did "[n]othing."

Child Protective Service (CPS) Investigators Jennifer Deible and Edna Campbell testified that Davontae was removed from Williams's home and placed in foster care in 1999 because Coleman physically abused him. Davontae was returned to Williams's custody about a year later. After her arrest in this case, Coleman told the two that she bruised Davontae by beating him with a belt in 2004. She spoke to her mother about the incident, and her mother told her to not to touch Davontae. She admitted that she tied up Davontae on two occasions with clothing to keep him from hurting himself or others. According to Campbell, Coleman said that Williams did not want to take Davontae to the doctor because she was afraid that the bruises and marks would prompt a doctor to call CPS. Coleman admitted to Campbell that she had hit and pushed Davontae, causing him to split his lip. She also told Campbell that Williams did not want Davontae to go to school because Williams was afraid that he would report the abuse and that school officials would call CPS. Coleman stated that Davontae had been tied up regularly since June and that the sore on his arm was caused by him fighting to be released. The pantry door had a lock on the top of the door frame, and investigators discovered a dry urine stain on the floor. But Coleman denied locking Davontae in the pantry. Coleman also said that Davontae had been sick for about a month before his death. He did not eat very much when fed, and he would throw up. Coleman stated that, in an attempt to help Davontae, she and Williams gave him a variety of over-the-counter medicines.

Dr. Lesther Winkler, a pathologist, testified for the defense. He stated that Davontae died from aspiration pneumonia, which "is the result of sucking food or particles of material which don't go into the stomach properly through the esophagus and are sucked instead into the trachea," which leads to the lungs. Dr. Winkler noted

---

6    Davontae's sister, who testified at Coleman's trial, will be referred to by her initials, D.W.

aspirated material in Davontae's lung and that his right lung was twice the size of his left because of the aspirated material. Dr. Winkler disagreed with Dr. Konzelmann's determination that the absence of fat around Davontae's heart was significant. In his opinion, children rarely have fat around the heart. As for the malnutrition, Dr. Winkler agreed that Davontae was malnourished; there was no evidence that Davontae was unable to metabolize food.

Dr. Nizam Peerwani, the Chief Medical Examiner with Tarrant County, also examined Davontae's body during the autopsy. The State called him to testify to rebut Dr. Winkler's testimony. He stated that a normal person does not aspirate and die and that there was no reason to suggest that Davontae aspirated given his medical history. Viewing the "entire picture," Dr. Peerwani stated, "even if he had aspirated, the pneumonia is not a very significant component in this child's death. Perhaps the most dramatic component is malnourishment . . . He died because of malnutrition."

*Coleman v. State*, slip op. at 2-7 (footnote added).

## II.    Facts Relating to Punishment

### A.    The State's case

The state court summarized the State's evidence for future dangerousness

on direct appeal:

CPS records show that Coleman was involved with the Williams family as early as 1995. In 1999, Coleman was the subject of a CPS abuse case involving Davontae. Davontae was removed from the home at that time because he was being abused by Coleman and his mother failed to protect him from the abuse. Davontae was returned to the family home only when Williams agreed not to let Coleman live in the home and CPS caseworkers were certain that Coleman was not living in the home. CPS records indicated, however, that at the time of Davontae's death, Coleman lived in the home more than fifty percent of the time and was considered by CPS as a care giver.

Coleman admitted to CPS investigators that she had pushed and hit Davontae, causing him to fall and split his lip, but she insisted that she had not beaten Davontae since February 2004. Coleman's own mother had told Coleman to leave Davontae alone, and her sister had advised her to get help for Davontae. Coleman also admitted to tying up Davontae with clothing at least twice, but insisted that it was for his own protection because he wandered at night. Davontae's sister, [D.W.], told the jury that Coleman kept Davontae tied up in the bathroom and whipped him with extension cords. [D.W.] also told the jury that Coleman beat her and her sister with belts, clothes hangers, and extension cords as well.

Dr. Kellogg identified 250 distinct injuries suffered by Davontae, including cigar or cigarette burns and ligature marks on his arms and legs, many of which were old enough to have formed scars. Dr. Konzelmann testified about a significant injury to Davontae's lip that would have, before it healed, made it difficult for him to eat and nearly impossible to drink. Davontae also had a deformity to one of his ears that was caused by long-term traumatic injury and ligature scarring on his penis caused by attempts to prevent Davontae from wetting his bed.

And as shown above, there was ample evidence of intentional starvation. Davontae had been healthy and growing in 1999; his starvation was not based on metabolic factors. The presence of depleted fat cells showed that he had received adequate nutrition at some time. Dr. Kellogg testified that there was no food matter in Davontae's system beyond his stomach, indicating that he had not eaten regularly. The jury heard from Dr. Kellogg that Davontae's death occurred over a number of months.

The jury also heard from Carol Bowdry, Coleman's own expert, that Davontae's injuries were torturous. Bowdry agreed on cross-examination that Coleman systematically and chronically abused Davontae. She testified that Davontae "went through agony." Bowdry also testified that abusers such as Coleman "may intend for the child to go through an awful lot of pain and suffering," but are surprised when a child dies from the abuse. Coleman's second expert, Dr. Mary Connell, testified on cross-examination that

even someone like Coleman who suffered abuse as a child would know that the systematic abuse of Davontae was wrong.

The State presented evidence of Coleman's prior felony convictions for burglary of a habitation and possession of a controlled substance. On cross-examination, defense expert Dr. Paula Lundberg–Love admitted that Coleman had revealed to her a conviction for unlawfully carrying a weapon when she was seventeen in 1993, an arrest for evading arrest in 1995, and a parole violation in 1997 that resulted in her return to prison.

*Id.* at 25-27.

## B.    The defense's case

The defense introduced evidence and testimony throughout trial describing Coleman's upbringing. Coleman was born to a thirteen-year-old mother, Patricia Coleman, who was impregnated by her step-father. 37 RR 45. Patricia, the mother of four children, was mentally retarded and had been abused and neglected during her childhood. 37 RR 45. Coleman's biological father spanked her when she was only four months old. When Coleman was six months old, she was sent to live with her grandmother in Tallulah, Louisiana, with fourteen people living in the same house. 37 RR 47. Later, when Coleman was less than three years old, her mother left Coleman at home alone with her younger brother. 37 RR 49. CPS was eventually notified of this and removed Coleman from her mother's custody and placed her in foster care. 37 RR 49.

Coleman lived in her first foster home approximately from the time she was three years old until she was five years old. This removal caused Coleman

to feel abandoned by her mother. 37 RR 52. Later, Coleman was placed in a second foster home from the ages five to six. 37 RR 53-55. During this period, Coleman's mother would not show up for visitations. 37 RR 56. Also during this period she began acting out, eating out of garbage cans and exhibiting signs of having suffered sexual abuse. 37 RR 56, 58-59. Children at school ridiculed Coleman because of her nickname, "Pig." 37 RR 56.

When Coleman was about seven years old, she was sent by CPS to live with her grandmother, Shirley. 37 RR 60. However, Coleman's mother, Patricia, soon took Coleman back to Louisiana to live with herself and Nathaniel Williams. 37 RR 62-63. While living there, Coleman witnessed Williams physically abuse Patricia. 37 RR 64. Also, Williams made Coleman feel like she was not a "legitimate" part of that household because she was not one of Williams's own children. 37 RR 64. Coleman was abused during this time by Williams's brother, "Lamby." 37 RR 64. That abuse included being whipped with extension cords. 36 RR 54-55; 37 RR 64.

Patricia "fled" to Fort Worth with her children, where Coleman lived with her aunt, Angie, and nine children. 37 RR 65. Coleman was stabbed in the back by one of her cousins while living there. 37 RR 65. Her uncle, Leotis, repeatedly raped her and the other children that lived in that home. 36 RR 91; 37 RR 67.

The defense also introduced testimony regarding factors that impeded Coleman from being able to properly care for a child, and specifically one with developmental delays like Devontae had. The jury was told that Coleman was a product of a "cycle of abuse," which would have affected her ability to understand proper methods of discipline. 36 RR 62-63, 65. One consequence of this "cycle of abuse" was that Coleman believed extension cords were an appropriate implement of discipline. 36 RR 67, 69. The defense also presented evidence that Coleman was bi-polar and suffered from depression. DX 50; 36 RR 184. Coleman also abused drugs starting at age thirteen. 36 RR 183-89, 196. Carol Bowdry, a social worker, testified that CPS had failed Davontae by returning him to his mother's custody in 1999 and later not removing him from that home. 36 RR 60-61. The victim, Davontae, had behavior problems and exhibited symptoms of attention deficit hyperactivity syndrome, which would have made it extremely difficult for a parent with little or no parenting skills to appropriately raise the child. 33 RR 28-30; 36 RR 62-63.

The jury also heard from two TDCJ employees who testified about the conditions under with Coleman would be supervised. 36 RR 123, 142-43, 148. Susan Ellis testified that Coleman would be seventy years old before she became eligible for parole. 36 RR 120. Jerry Rucker testified that Coleman had taken classes to obtain her GED, attended religious services while in jail, and did not

-12-

have enemies in jail. 36 RR 27-28, 38. And as Coleman's trial counsel told the jury during closing, Coleman had only committed violent acts against Davontae, and she would not have access to children while in prison. 37 RR 144-45.

## STANDARD OF REVIEW

Confined pursuant to a state court judgment, Coleman is entitled to relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, any claims Coleman raises which are based solely on alleged violations of state law should be denied as a matter of law.

Habeas relief is also inappropriate for claims which are either unexhausted and procedurally defaulted, or claims which were exhausted yet were dismissed in a successive state habeas application and, thus, are also procedurally defaulted. Indeed, under the AEDPA, a federal habeas application shall not be granted unless:

(A)     the applicant has exhausted the remedies available in the courts of the State; or

(B)     (i)     there is an absence of available State corrective process; or

       (ii)     circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). Moreover, a writ may be denied on the merits, notwithstanding any failure to exhaust available state court remedies. 28 U.S.C. § 2254(b)(2).

Regarding exhausted claims, under the AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless that adjudication:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has explained that a state court decision is "contrary to" clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent but reaches an opposite result.[7] (*Terry*) *Williams*, 529 U.S. at 405-06.

---

[7]     "Clearly established Federal law" refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (citing (*Terry*) *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). "In other words, 'clearly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court reaches its decision." *Id.* at 71-72 (citing (*Terry*) *Williams*, 529 U.S. at 405, 413, and *Bell v. Cone*, 535 U.S. 685, 698 (2002)).

A "run-of-the-mill" state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. *Id.* at 406. To this end, a state court unreasonably applies Supreme Court precedent *only if* it correctly identifies the governing precedent but unreasonably applies it to the facts of the particular case. *Id.* at 407-09. And as the Supreme Court recently described this deferential standard, in order to determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or ... *could have supported*, the state court's decision; and then it must ask *whether it is possible fairminded jurists could disagree* that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (emphasis added). Indeed, this is the "only question that matters under § 2254(d)(1)." *Id.*

Thus, "a state court's only decision that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2002)); *see also Woodford v. Visciotti*, 537 U.S. 19, 27 (2002) (federal habeas relief is only merited where the state court decision is both incorrect *and* objectively unreasonable, "whether or not [this Court] would reach the same conclusion"). Moreover, "evaluating whether a rule application was

unreasonable requires considering the rule's specificity. The more general the rule, the more leeway the courts have in reaching outcomes in case-by-case determinations." *Alvarado*, 541 U.S. at 644. This is particularly true when reviewing a state court's application of *Strickland v. Washington*, 466 U.S. 668 (1984), which when analyzed in conjunction with § 2254(d) creates a difficult to surmount and "doubly" deferential assumption in favor of the state court denial. *Richter*, 131 S. Ct. at 786.

It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *Id.*

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court litigation of claims already rejected in state proceedings. It preserves the authority to issue the writ in cases where there is *no possibility fairminded jurists could disagree* that the state court's decision conflicts with this Court's precedents. It goes no farther. [28 U.S.C. §] 2254(d) reflects the view that habeas corpus is a "guard against *extreme malfunctions* in the state court criminal justice systems, *not a substitute for ordinary error correction through appeal.*"

*Id.* (emphasis added, internal citations omitted).

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, "not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *see also Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under [§] 2254(d) should be on the ultimate legal conclusion the

-16-

state court reached and not on whether the state court considered and discussed every angle of the evidence"); *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) ("[W]e review only the state court's decision, not its reasoning or written opinion[.]"). And a state court's decision need not expressly cite any federal law or even be aware of applicable Supreme Court precedent in order to be entitled to deference. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003); *Early v. Packer*, 537 U.S. 3, 8 (2002) (state court decision must be upheld so long as the result does not contradict Supreme Court precedent).

If the Supreme Court has not "broken sufficient legal ground to establish [a] ... constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar" under either the "contrary to" or "unreasonable application" standard. (*Terry*) *Williams*, 529 U.S. at 381. Stated differently:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there *was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

*Richter*, 131 S. Ct. 786-87 (emphasis added). And a federal court must be wary of circumstances in which it must "extend a [legal] rationale" of the Supreme Court "before it can apply it to the facts at hand" because such a process

suggests the proposed rule is not "clearly established." *Alvarado*, 541 U.S. at 666.

Regarding questions of fact, federal courts must presume correct the factual findings of the state courts unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "This presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

Additionally, except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which would challenge a state court finding must have been presented to the state court. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (explaining that § 2254(d)(1) "refers in the past tense, to a state court adjudication that 'resulted in' a decision that was contrary to, or 'involved' an unreasonable application of, established law." This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at the time, i.e., the record before the state court."). Further, because a federal habeas court is also prohibited from granting relief unless a decision was based on an "unreasonable determination of the facts in light of the evidence *presented in the*

*state court proceeding,*" it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner. 28 U.S.C. § 2254 (d)(2) (emphasis added).

Finally, where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; *and* (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found him guilty. 28 U.S.C. § 2254(e)(2). A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence. (*Michael*) *Williams v. Taylor*, 529 U.S. 420, 436 (2000); *Beazley v. Johnson*, 242 F.3d 248, 272-73 (5th Cir. 2001). For example, a petitioner's failure to present controverted, previously unresolved factual issues to the state court is sufficient to constitute "failure" under the plain meaning of § 2254(e)(2). (*Michael*) *Williams*, 529 U.S. at 433; *Beazley*, 242 F.3d at 273. But even if a petitioner can meet the foregoing standard, it is within this Court's discretion to deny a hearing if sufficient facts exist to make an informed decision on the merits. *Clark v. Johnson*, 227 F.3d 273, 284-85 (2000).

## ARGUMENT

### I. Coleman Was Not Denied Constitutionally Effective Assistance of Either Trial or Appellate Counsel.

Coleman claims that she was denied effective assistance of counsel at trial and on appeal due to alleged errors committed by her trial and appellate counsel. Specifically, Coleman claims her trial counsel was ineffective for failing to: (1) meaningfully investigate the facts of the case by interviewing various witnesses in order to rebut the kidnapping element of the capital murder charge, and (2) conduct an adequate investigation into, or effectively present, mitigation evidence. Petition at 6; Pet. Memo at 42-60. She claims her appellate counsel was ineffective for failing to allow her conviction for injury to a child to become final prior to her conviction for capital murder becoming final. Petition at 7; Pet. Memo at 66-76. All of these claims, however, were reasonably and correctly rejected by the state courts. Thus, as discussed more fully below, Coleman is not entitled to relief on the basis that she was denied constitutionally effective assistance of either trial or appellate counsel.

The Sixth Amendment together with the Due Process Clause guarantee a defendant both the right to a fair trial and the right to effective assistance of counsel at that trial. *Strickland*, 466 U.S. at 684-86. A defendant's claim that she was denied constitutionally effective assistance of counsel requires her to prove both that: (1) counsel rendered deficient performance, and (2) counsel's

actions resulted in actual prejudice. *Id.* at 687-88, 690. Importantly, failure to prove either deficient performance or prejudice will defeat an ineffective-assistance-of-counsel claim, making it unnecessary to examine the other prong. *Id.* at 687.

In order to demonstrate deficient performance, Coleman must show that, in light of the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness," i.e., "prevailing professional norms." *Id.* at 689-90; *see also Nix v. Whiteside*, 475 U.S. 157, 165 (1986). The Supreme Court has admonished that judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effect of hindsight."[8] *Strickland*, 466 U.S. at 689-90; *see also Richter*, 131 S. Ct. at 788 ("It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence."); *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.") (citations omitted). Accordingly, there is a "strong presumption" that the alleged deficiency "falls within the wide range of reasonable professional assistance." *Strickland*, 466

---

[8] "Representation of a capital defendant calls for a variety of skills. Some involve technical proficiency connected with the science of law. Other demands relate to the art of advocacy. The proper exercise of judgment with respect to the tactical and strategic choices that must be made in the conduct of a defense cannot be neatly plotted in advance by appellate courts." *Stanley v. Zant*, 697 F.2d 955, 970 & n.12 (11th Cir. 1983).

U.S. at 689. If there is *any* "reasonable argument that counsel satisfied *Strickland*'s deferential standard," the state court's denial will be upheld. *Richter*, 131 S. Ct. at 788.

Even if deficient performance can be established, Coleman must still affirmatively prove prejudice that is "so serious as to deprive [her] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. This requires her to show a reasonable probability that, but for counsel's deficiencies, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability" is one sufficient to undermine confidence in the outcome. *Id.* Thus, the mere possibility of a different outcome is insufficient to prevail on the prejudice prong. *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999). To prove appellate prejudice, a petitioner must show that but for counsel's deficient performance "[s]he would have prevailed on appeal." *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000). As recently explained by the Supreme Court, "[T]he question in conducting *Strickland*'s prejudice analysis is *not* whether a court can be certain [that] counsel's performance had no effect on the outcome or whether it is possible [that] a reasonable doubt might have been established [had] counsel acted differently." *Richter*, 131 S. Ct. at 791 (emphasis added). Rather, the "likelihood of a different result must be substantial, not just conceivable." *Id.* at 792.

Finally, with respect to errors at the sentencing phase of a death penalty trial, the relevant inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer [] would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *see also Riley v. Cockrell*, 339 F.3d 308, 315 (5th Cir. 2003) ("If the petitioner brings a claim of ineffective assistance with regard to the sentencing phase, he has the difficult burden of showing a reasonable probability that the jury would not have imposed the death sentence in the absence of errors by counsel.")(internal quotation marks omitted)). "In assessing prejudice, [the reviewing court] reweigh[s] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

A.  **Coleman's claim that her trial counsel were ineffective for failing to investigate the facts of the case in order to rebut the kidnapping element of the capital murder charge is without merit.**

Coleman first complains that her trial counsel failed to investigate the facts of the case by interviewing and presenting the testimony of Tonya Coleman Brown (Brown), Sharon Coleman (Sharon) and Marcella Williams (Williams). Petition at 6; Pet. Memo at 45-53. Those witnesses, Coleman avers, would have convinced the jury that she did not kidnap Davontae, thus negating the capital murder charge. But Coleman has not established that any of those witnesses were willing or available to testify. Nor has she shown that any of their

purported testimony would have been favorable to her defense. Thus claim is without merit.

It is true that "counsel has a duty to make a reasonable investigation of defendant's case or to make a reasonable decision that a particular investigation is unnecessary." *Ransom v. Johnson*, 123 F.3d 716, 723 (5th Cir. 1997) (citation omitted); *see also Rompilla v. Beard*, 545 U.S. 374 (2005) (emphasizing counsel's duty under *Strickland* to make reasonable investigation); *Wiggins*, 539 U.S. 510 (same). But "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 383. The burden of demonstrating that counsel's investigation or trial decisions were professionally unreasonable remains with the criminal defendant challenging counsel's performance. *Strickland*, 466 U.S. 689 (emphasizing "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance").

To meet this burden, a defendant must do more than merely allege a failure to investigate; she must affirmatively prove that the investigation counsel actually conducted fell below minimum professional standards. *Id.* at 690 ("A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the

result of reasonable professional judgment."); *see also id.* at 687 (explaining that as to deficient performance, "the defendant must show . . . that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."). She must also state with specificity what additional evidence would have resulted from further investigation and how such evidence would have altered the outcome of the case. *Moawad v. Anderson*, 143 F.3d 942, 948 (5th Cir. 1998); *Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994); *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).

And, more specifically, to prevail on an ineffective assistance of counsel based on counsel's failure to interview and call a witness, the petitioner must (1) name the witness, (2) demonstrate that the witness was available to testify and would have done so, (3) set out the content of the witness's proposed testimony, and (4) show that the testimony would have been favorable to a particular defense. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009); *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986). Complaints of uncalled witnesses are not favored on federal habeas corpus. *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)(rejecting claim of ineffective assistance of counsel based on a failure to call witnesses because the presentation of witnesses is trial strategy and because speculation as to what a witness would have testified to is uncertain). Where the only evidence of a missing witness's testimony is from the

defendant, the court must view the petitioners claim of ineffective assistance of counsel with great caution. *Schwander v. Blackburn*, 750 F.2d 494, 500 (5th Cir. 1985).

Further, the decision of whether to call certain witnesses to testify is a matter of trial strategy, entitled to a strong degree of deference. *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984)(stating that a petitioner must overcome a strong presumption that trial counsel's decision in not calling a particular witness was a strategic decision); *see Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993); *see also Williams v. Collins*, 16 F.3d 626, 632 (5th Cir. 1994)(finding defense attorneys were not ineffective for deciding not to call certain witnesses because of their concern that the testimony would have opened the door to more damaging evidence under cross-examination). The Fifth Circuit has stated that, a "court might even disagree with such a decision, viewing the case in hindsight, and still determine that the decision was not so seriously inept as to have been professionally unreasonable." *Williams*, 16 F.3d at 632. Finally, counsel's failure to investigate will not rise to the level of ineffective assistance where the evidence in question is either cumulative, unknown, or possibly harmful to the defense. *See Anderson*, 18 F.3d at 1220-21.

### 1.    Tonya Coleman Brown and Sharon Coleman

Coleman argues that trial counsel was ineffective for failing to investigate, and call, Tonya Coleman Brown and Sharon Coleman in order to rebut the charge that Coleman kidnapped Davontae. Pet. Memo at 45-53. She claims that Brown and Sharon would have told the jury that Davontae was not restrained and that he was allowed outside of Coleman and Williams's apartment. *Id.* at 46-48.  In support of this claim, Coleman presents affidavits by Brown and Sharon in which they state that during the time preceding Davontae's death (1) they had seen Davontae playing with other children, (2) they had never seen Davontae tied up in any manner whatsoever, and (3) Davontae appeared to be in good health.  Pet. Memo at 46.  Had Brown and/or Sharon been called to testify to these facts at trial, Coleman argues, the kidnapping element of the capital murder charge would have been negated.  Pet. Memo at 52.

Coleman's trial counsel, Michael Heiskell and Fred Cummings, provided affidavits to the state habeas court in which they explained why Brown and Sharon were not called to testify.  Mr. Cummings explained in his affidavit that the defense team interviewed Brown and Sharon and that the strengths and weaknesses of their testimony were considered and discussed.[9]  *Id.* at 231.  Mr.

---

[9]    Mr. Cummings provided a memorandum of an interview with Patricia, Yvonne and Sharon Coleman as an example of interviews performed by the defense team with members of Coleman's family.  SHCR-01 at 245-48.

Heiskell stated in his affidavit that the defense team "received very little assistance from the family of Lisa, who seemed to want to distance themselves from Lisa, and her co-defendant Marcella Williams, the mother of Davontae." SHCR-01 at 228.

First, neither Brown's or Sharon's affidavit establish that they were willing or available to testify. And this is fatal to Coleman's claim. *Day*, 566 F.3d at 538. In any event, as Mr. Heiskell's affidavit indicates, Coleman's family provided the defense team "very little assistance" and wanted to distance themselves from Coleman. SHCR-01 at 228. Moreover, Brown's and Sharon's assertions that they would have been willing to testify or that they would have testified in a manner consistent with the statements in their affidavits if they had been contacted by the defense team are utterly conclusory. Pet. Memo at 46, 48. In fact, their assertions that they were not contacted by Coleman's defense team are directly contradicted by Mr. Cumming's statement that they interviewed "over two dozen family members, including Sharon Coleman and Tonya Coleman." SHCR-01 at 231. Brown's and Sharon's statements that they were available and/or willing to testify, therefore, are not credible and unsupportable.

The state habeas court relied on trial counsels's affidavits and entered findings and conclusions based on the affidavits, concluding that Colemans's

trial counsel was not ineffective. SHCR-01 at 261, 266-68. The Court of Criminal Appeals denied relief based on those findings. Coleman has failed to rebut the presumption of correctness afforded to the state habeas court's findings. 28 U.S.C. § 2254(e)(1); *Valdez*, 274 F.3d at 948 n.11. Consequently, Coleman has failed to show that either Brown or Sharon were willing to testify or that they would have testified in a manner consistent with their affidavits. That fact alone is a sufficient basis on which to reject this claim. *Day*, 566 F.3d at 538.

Further, Brown and Sharon's purported testimony would not have been favorable to the defense and it would have contradicted the defense's strategy. And, perhaps more importantly, the testimony would have been readily impeached. For example, Brown states in her affidavit that she saw Davontae "in good health" during the time leading up to his death and that she never saw Davontae restrained "in any manner whatsoever." Pet. Memo at 46. That purported testimony would have been directly contradicted by the extensive evidence presented at trial, including the pictures of the estimated 250 injuries on Davontae's body, the lay and expert testimony that told the jury that Davontae had been restrained over a period of time and the evidence that he had been starved, which evidence included the fact that he weighed less than forty pounds at the time of his death. *See e.g.*, 27 RR 68 (responding EMT thought

that Davontae was between three to five years old), 133, 143; 29 RR 94-121 (medical examiner relating Davontae's injuries, history of being bound, and his state of malnourishment); 30 RR 40-41 (D.W. witnessed Coleman whip and bind Davontae with extension cords), 191-92 (Coleman admitted to CPS worker that she had secreted Davontae from others); 31 RR 65 (same); 32 RR 118-139 (medical examiner testifying as to Davontae's restraint and starvation). Any testimony from Brown or Sharon that Davontae had been "in good health" and had not been restrained "in any manner whatsoever" would have been rendered wholly incredible in the face of all of that evidence.

Moreover, the purported testimony would not have even touched on the fact that Williams and Coleman secreted Davontae from people, such as CPS or school officials, who may have been of assistance to him. *See Coleman v. State*, slip op. at 5 ("Coleman told CPS investigators that Williams did not want Davontae to go to school or to a doctor because she was afraid that Davontae would report the abuse and someone would call CPS. Coleman did not defy Williams, and the record indicates that the two acted in concert. [D.W.] testified that Davontae was tied up in the bathroom. Also, according Coleman's own statement, Davontae had been restrained inside the home since June 2004."). Even if the jury had been presented (and believed) testimony from Brown and Sharon that Davontae had not been restrained, the jury still would have

-30-

considered the admissions from Coleman and Williams that they secreted Davontae in a manner so that he did not have access to CPS or medical attention.

Finally, Brown's and Sharon's testimony that Davontae acted like a "normal child" would have been inconsistent with the defense's strategy of showing that Davontae was a problem child, one that presented difficulties to Williams and Coleman in raising him. The defense team's mitigation strategy of showing that Davontae was not, in fact, a normal child would have been hindered by Brown's and Sharon's purported testimony. *See* SHCR-01 at 249 (mitigation expert discussing Davontae's developmental difficulties as a theme for mitigation); *see e.g.,* 33 RR 22-34; 36 RR 57, 93-94. And, since Coleman's trial counsel had investigated Brown and Sharon as potential witnesses and made the strategic decision to not call them, that decision is nothing less than sound trial strategy, the result of which did not prejudice Coleman in any way. *Williams v. Collins*, 16 F.3d at 632; *Alexander*, 775 F.2d at 602.

As the state habeas court found, Coleman's family never told trial counsel the facts stated in their current affidavits. SHCR-01 at 261. Nor did Coleman's family provide trial counsel with any credible evidence that would have negated the kidnapping element of the capital murder charge. *Id.* Consequently, the state habeas court concluded that Coleman had not established either deficiency

or prejudice resulting from trial counsels's alleged failure to interview and present the testimony of Brown and Sharon. *Id.* at 266; *Ex parte Coleman*, No. 72,094-01 (Tex. Crim. App. August 25, 2010)(unpublished order). Coleman has not demonstrated that the state court's decision was unreasonable. *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011).

### 2.　Marcella Williams

Coleman next argues that trial counsel was ineffective for failing to investigate and call Marcella Williams in order to rebut the charge that Coleman kidnapped Davontae. Pet. Memo at 48-53. She claims that Williams would have told the jury that Davontae was not restrained and the he was allowed outside of Coleman and Williams's apartment. *Id.* at 46-48. In support of this claim, Coleman presents an affidavit by Williams in which she states that (1) Davontae was not restrained the night he died, (2) Davontae had been restrained for about ten minutes the day before he died, (3) Davontae went to Coleman's mother's apartment the day before he died, (4) Coleman and Williams would keep Davontae restrained "from time to time" for as long as half a day, (5) Davontae often played outdoors, (6) neither Coleman or Williams intended to secrete Davontae from any person, and (7) Williams authorized Davontae's restraint. Pet. Memo at 49-50. Had Williams been called to testify to these facts at trial,

Coleman argues, the kidnapping element of the capital murder charge would have been negated. Pet. Memo at 52.

Again, Coleman's trial counsel provided affidavits to the state habeas court in which they explained why Williams was not called to testify. Mr. Cummings explained in his affidavit that Williams was a co-defendant of Coleman's in Davontae's murder. Supp. SHCR-01 at 15-16. Williams had provided a statement to the police and CPS that implicated Coleman. *Id.* Mr. Cummings knew that since Williams was represented by counsel, any request to interview Williams would have been denied as being potentially damaging to her. *Id.* at 15. Similarly, Mr. Heiskell stated in his affidavit that he knew that Williams's attorney would not consent to her waiving her Fifth Amendment rights and being interviewed when, at that point, she still faced the possibility of the State seeking the death penalty in her trial. *Id.* at 14.

First, Williams's affidavit does not even allege that she was willing or available to testify or that she would have testified in a manner consistent with the statements in her affidavit. Pet. Memo at 49-50. The fact that Williams does not even allege that she was willing or able to testify, alone, is a sufficient basis on which to deny this claim. *Day*, 566 F.3d at 538 ("[N]owhere in the affidavit does Galaznik state that he was available to testify at trial, that he would have done so, or that he would have testified in accord with the opinions

and conclusions he states in his affidavit."). And, moreover, the fact that Williams was facing a later trial in which she may have faced the death penalty effectively rendered her testimony unavailable. Supp. SHCR-01 at 14, 15; *Gregory v. Thaler*, 601 F.3d 347, 354 n.2 (5th Cir. 2010)("In order to help Gregory, however, Dorsey and Hamilton would have had to testify about their own involvement in the methamphetamine lab and would thereby have inculpated themselves in their own trials. It is therefore unlikely that either witness would have been available to testify on Gregory's behalf."). Any assertion by Williams at this point that she would have been willing to testify or that she would have testified in a manner consistent with the statements in her affidavit is utterly conclusory and unsupportable.

Further, Williams's purported testimony would not have been favorable to the defense and it would have contradicted the defense's strategy. And the testimony would have been readily impeached. For example, Williams states in her affidavit that neither she or Coleman intended to hide or secrete Davontae from any person. Pet. Memo at 50. That purported testimony would have been directly contradicted by Williams's own prior inconsistent statements provided to the police, as well as Coleman's statements to CPS. Supp. SHCR-01 at 21, 23; 30 RR 191-92; 31 RR 65. The suggestion that Williams's testimony would have convinced the jury that Davontae was not kidnapped is, therefore, meritless.

Moreover, Williams's purported testimony would not have even touched on the fact that Davontae's body had 250 wounds and ligature markings. Nor would the testimony have touched on the fact that Davontae had been starved to death. And, since Coleman's trial counsel had investigated Williams as potential witnesses and made the strategic decision to not call her, that decision is nothing less than sound trial strategy, the result of which did not prejudice Coleman in any way. *Alexander*, 775 F.2d at 602; Supp. SHCR-01 at 15 ("I had no expectation that Marcella L. Williams would say anything inconsistent with the incriminating statements against my client that she had already given the police and CPS workers.").

As the state habeas court found, Williams was not available to testify in Coleman's trial. Supp. SHCR-01 at 29. Moreover, as discussed above, Williams's testimony would not have been favorable and would not have negated the kidnapping element of the capital murder charge. The state habeas court concluded that Coleman had not established either deficiency or prejudice resulting from trial counsel's alleged failure to interview and present Williams's testimony. *Id.* at 29-30; *Ex parte Coleman*, No. 72,094-01 (Tex. Crim. App. August 25, 2010)(unpublished order). Coleman has not demonstrated that the state court's decision was unreasonable. *Richter*, 131 S. Ct. at 785.

B.   **Coleman's claim that her trial counsel were ineffective for failing to investigate and effectively present mitigation evidence is without merit.**

Coleman next complains that her trial counsel failed to investigate and effectively present mitigation evidence.[10]  Petition at 6; Pet. Memo at 55-60. Specifically, Coleman claims that her trial counsel failed to obtain any neuropsychological testing of her.[11]  Pet. Memo at 58-59.  Had the results of such testing been presented to the jury, Coleman appears to suggest, she would not have received the death penalty.[12]  Coleman has not, however, presented any

---

[10]     Although Coleman frames this claim as one of ineffective assistance of counsel, it appears that the basis of the claim is the allegation that the defense team's mitigation expert, Toni Knox, failed to recommend to the attorneys that neuropsychological testing be performed.  *See* SHCR-01 at 148 (affidavit of Toni Knox)("I believe that the attorneys may have ordered the testing if I had made the recommendation").  Coleman does not point to any authority that indicates that a mitigation expert's failure to conduct a thorough investigation or recommend further investigation can be attributed to trial counsel so as to form the basis for a claim of ineffective assistance of *counsel*.  It appears to the Director that there is no clearly established federal law that would indicate that such a claim is cognizable. Nevertheless, the Director will address the claim in relation to the alleged failure on the part of trial counsel to obtain neuropsychological testing.

[11]     Presumably, such testing would have focused on the effects Coleman's drug use had on her mental health.  *See* SHCR-01 at 148.

[12]     Coleman attempts to bolster her claim by citing to the American Bar Association (ABA) Guidelines and citing to the Supreme Court cases that have referenced the same.  Pet. Memo at 57-59.  But the Supreme Court has soundly rejected the notion that the ABA's guidelines are an "inexorable command with which all capital defense counsel must fully comply" to be constitutionally effective.  *Bobby v. Van Hook*, 130 S. Ct. 13, 17 (2009) (per curiam) (internal quotation marks omitted). The Court recognized that *Strickland* "stressed . . . that 'American Bar Association standards and the like' are 'only guides' to what reasonableness means, not its definition." *Id.* at 17.  The Court emphasized that the same was true of all state and private organization rules, noting that they are "free to impose whatever specific rules

evidence as to what neuropsychological testing would have revealed or how it would have been in any way mitigating. Nor has she shown that the results of any testing would have been favorable to her defense. Moreover, Coleman has not identified any mitigation evidence that should have or could have been more effectively presented. Therefore, this claim is without merit.

First, to the extent Coleman argues that her trial counsel did not effectively present mitigation evidence, the argument is essentially not that her trial counsel should have done something *better*, but that they should have done something *differently*. Such an argument flies in the face of the mandate of *Strickland*, that counsel's actions are not to be judged in this manner. Indeed, the Fifth Circuit has recognized that it "must be particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000)(internal quotation marks and citation omitted). A disagreement with trial counsel as to the "manner and style" with which

---

they see fit to ensure that criminal defendants are well represented," but "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Id.* (quotation marks omitted). The Court additionally chided the lower court of appeals for having used guidelines promulgated years after the trial in question to evaluate counsel's performance. *Id.* ("Judging counsel's conduct in the 1980's on the basis of these 2003 Guidelines—without even pausing to consider whether they reflected the prevailing professional practice at the time of trial—was error.").

mitigating evidence is presented is insufficient to merit habeas relief. *Ries v. Quarterman*, 522 F.3d 517, 528-29 (5th Cir. 2008). And, further, Coleman does not point to any evidence or argument that was presented to the jury that should have been more effectively presented. The claim is, therefore, conclusory and without merit.

To the extent Coleman complains that her trial counsel failed to investigate mitigation evidence, her challenge to her trial counsel's investigation into the effect her substance abuse had on her mental health is without merit. Most importantly, Coleman does not provide any proof (*e.g.*, the results of neuropsychological testing; affidavits from proposed expert witnesses) as to what any neuropsychological testing would have shown.[13] At most, Coleman speculates that such testing would have revealed some mitigating evidence relating to the effect her drug use had on her mental health. *See* SHCR-01 at 148 (defense expert recommended to Coleman's mitigation expert that neuropsychological testing be done because of Coleman's drug use). Such speculation is wholly insufficient to establish that her trial counsel were deficient. *Moawad*, 143 F.3d at 948 ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the

---

[13]     If Coleman were to present any such evidence in federal court, that evidence would be unexhausted because no such evidence was presented to the state habeas court.

investigation would have revealed and how it would have altered the outcome of the trial"); *compare Smith v. Quarterman*, 471 F.3d 565, 576 (5th Cir. 2006)("Although Smith argues that his counsel should have called Dr. Dickerson to provided updated testimony at the third trial in 1999, Smith did not furnish an updated report from Dr. Dickerson in the habeas proceedings. Therefore, he offers only speculation that Dr. Dickerson could have provided helpful testimony in 1999."), *with Blanton v. Quarterman*, 543 F.3d 230, 237-38 (5th Cir. 2008)("Blanton attached exhibits to his state habeas filing, including childhood medical records concerning his difficult birth and childhood injuries, school records, and reports from two psychological professionals, Gordon Potter and Dr. Jim Cox. Mr. Potter and Dr. Cox concluded that Blanton likely suffered from organic brain damage."). Coleman cannot establish an entitlement to relief absent any proof as to what neuropsychological testing would have revealed.

Similarly, Coleman cannot show that her trial counsel were deficient by failing to investigate and present evidence from neuropsychological testing where the results of such testing could have been damaging to her defense. As Coleman provides no evidence as to what such testing would have revealed, it is as equally plausible that such testing would have revealed that she presented a future danger to society as it is plausible that it would have revealed that her culpability for the murder of Davontae was mitigated due to any mental

impairment caused by drug use. *See Williams v. Cain*, 125 F.3d 269, 278 (5th Cir. 1997)("The failure to present this evidence would not constitute 'deficient' performance within the meaning of *Strickland* if [trial counsel] could have concluded, for tactical reasons, that attempting to present such evidence would be unwise."); *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002) (failure to present evidence of troubled childhood, mental retardation diagnosis as a child, low IQ test score, being put on a psychomotor inhibitor, and good behavior in institutional settings not prejudicial because some of the evidence was double edged, and the rest had only "minimal[]" mitigating value; also, evidence of petitioner's future dangerousness was overwhelming); *Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002) (counsel not ineffective for failing to present evidence of alleged brain injury, abusive childhood, and drug and alcohol problems because evidence is "double-edged"); *Kitchens v. Johnson*, 190 F.3d 698, 702-03 (5th Cir.1999) (finding counsel's decision not to investigate mitigating evidence of child abuse, alcoholism, and mental illness was sound strategy where evidence was "double-edged" in nature).

Further, there was evidence presented during the mitigation phase regarding the effect drug use would have had on Coleman's mental health. 36 RR 180, 183, 196-201. Dr. Paula Lundberg-Love interviewed Coleman prior to trial in order to determine "information on her substance abuse history, the kind

of drugs she's abused, the doses, how long she's abused drugs" and her mental health.[14] 36 RR 181; DX 54. She testified that Coleman began smoking marijuana at the age of thirteen and that her drug use at such an early age may have impaired her brain development. 36 RR 183, 186. She also testified that Coleman had undergone a psychological evaluation that showed that Coleman was bipolar. 33 RR 184. Coleman's use of drugs would have caused irritability, hostility, anxiety, fear, extreme energy, and possibly violence. 36 RR 184-85, 196-97. Coleman has not shown that neuropsychological testing would have revealed any different or additional evidence than that presented through Dr. Lundberg-Love. Her trial counsel was not deficient in failing to obtain neuropsychological testing where the results of such testing, at best, would have been cumulative to Dr. Lundberg-Love's testimony. *Van Hook*, 130 S. Ct. at 19.

For the same reason, Coleman cannot show that she was prejudiced by her trial counsel's alleged failure to obtain neuropsychological testing. Dr. Lundberg-Love interviewed Coleman and testified as to the effect Coleman's drug use likely had on her brain development and mental health. 36 RR 180, 183, 196-201. Coleman fails to point to any "neuropsychological" evidence that would have been mitigating to any extent, much less evidence that would have

---

[14]    Coleman has not differentiated the type of information learned by Dr. Lundberg-Love's interview from the type of information neuropsychological testing would have revealed.

resulted in a different verdict at the punishment phase. *Riley*, 339 F.3d at 315. Moreover, under Fifth Circuit precedent, counsel's failure to call witnesses will not constitute ineffective assistance "unless [Coleman] demonstrates prejudice arising therefrom." *Alexander*, 775 F.2d at 602. And to do that, Coleman must show not only that this testimony would have been favorable, but also that the witness would have testified at trial. *Id.* In the instant case, Coleman has not demonstrated, by affidavit or other means, that there was an expert willing to testify, much less that the substance of that testimony would have been favorable. As such, any allegation that Coleman was prejudiced by her trial counsel's failure to obtain neuropsychological testing amounts to nothing more than rank speculation, and cannot form the basis of federal habeas relief. *Kinnamon v. Scott*, 40 F.3d 731, 735 (5th Cir. 1994).

As the state habeas court found, Coleman has not presented any evidence that could have been discovered before trial and presented to the jury. SHCR-01 at 261-62. The state habeas court concluded that Coleman had not established either deficiency or prejudice resulting from trial counsel's alleged failure to have Coleman undergo neuropsychological testing and failure to present the results of such testing to the jury. *Id.* at 261; *Ex parte Coleman*, No. 72,094-01 (Tex. Crim. App. August 25, 2010)(unpublished order). Coleman has not

demonstrated that the state court's decision was unreasonable. *Richter*, 131 S.
Ct. at 785.

**C.    Coleman's claim that she was denied effective assistance of
       appellate counsel is without merit.**

Coleman claims that she was denied effective assistance of appellate
counsel because her appellate counsel appealed her conviction for injury to a
child, thereby preventing that conviction from becoming final and barring her
conviction for capital murder on double jeopardy grounds.  Petition at 7; Pet.
Memo at 66-76.  As the Court of Criminal Appeals held, however, any successful
double jeopardy challenge in this case would have invalidated Coleman's
conviction for injury to a child, not her capital murder conviction.[15]  Moreover,
Coleman has not shown that the capital murder and injury to a child charges
were the "same offense" for purposes of double jeopardy.  Consequently, Coleman
has established neither deficiency or prejudice with regard to this claim.

First, the remedy Coleman seeks with regard to this claim is the vacating
of her capital murder conviction.  Pet. Memo at 76.  It is clear, however, that the
proper remedy for a double jeopardy violation would be to affirm the capital
murder conviction and vacate the lesser (*i.e.*, injury to a child) conviction.  *Bigon*

---

[15]    And, perhaps more importantly, Coleman does not point to anywhere in
the record that her trial counsel raised a double jeopardy objection on the ground that
prosecution of the capital murder charge was barred because the injury to a child
charge the "same offense."  Therefore, any double jeopardy issue may well have not
been preserved for appeal. *Langs v. State*, 183 S.W.3d 680, 686 (Tex. Crim. App. 2006).

*v. State*, 252 S.W.3d 360, 373 (Tex. Crim. App. 2008); *Coleman v. State*, slip op. at 7 (Tex. Crim. App.); SHCR-01 at 225 (affidavit of appellate counsel). Coleman cannot show that her appellate counsel was deficient for not seeking to obtain a result which would have been legally unobtainable. For the same reason, Coleman could not have been prejudiced by her appellate counsel not allowing her injury to a child conviction to become final.

Moreover, it has been held that capital murder and injury to a child are not the "same offenses." *Williams v. State*, 294 S.W.3d 674, 679-80 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd); *Johnson v. State*, 208 S.W.3d 478, 511 (Tex. App.—Austin 2006, pet. ref'd); Tex. Penal Code § 22.04(h)(Vernon's 2004). Also, as the state habeas court found, each of the charges in this cases required proof of elements that the other did not. SHCR-01 at 264. Any double jeopardy challenge to Coleman's convictions would have failed. Therefore, her appellate counsel's decision to not allow her injury to a child conviction was not deficient and did not prejudice her in any way.

Coleman's appellate counsel followed the correct procedure in pursuing an appeal of the capital murder conviction and bifurcating the non-capital appeal. *Callins v. State*, 726 S.W.2d 555, 558 (Tex. Crim. App. 1986); Tex. Code Crim. Proc. arts. 4.03 and 4.04. Counsel's decision to appeal the injury to a child

conviction was simply a correct and reasonable strategic decision. SHCR-01 at 225.

As the state habeas court found, Coleman has not established either deficiency or prejudice. SHCR-01 at 268-69; *Ex parte Coleman*, No. 72,094-01 (Tex. Crim. App. August 25, 2010)(unpublished order). Coleman has also not demonstrated that the state court's decision was unreasonable. *Richter*, 131 S. Ct. at 785. Therefore, this claim should be denied.

## III. Coleman's Claim of Actual Innocence Must Fail.

Pointing to the affidavits obtained from Brown, Sharon and Williams, Coleman claims she has established actual innocence because that evidence establishes that "no reasonable juror could have convicted her of the charged offense of capital murder." Pet. Memo at 62. As an initial matter, it is well established that free-standing claims of actual innocence cannot support federal habeas relief. *Herrera v. Collins*, 506 U.S. at 404. Left open was the question whether a "truly persuasive" actual innocence claim would state a constitutional violation sufficient for habeas relief.[16] *Id.* at 417. However, the Fifth Circuit has consistently rejected this theory. *Dowthitt*, 230 F.3d at, 741; *Graham v. Johnson*, 168 F.3d 762, 788 (5th Cir. 1999); *Lucas v. Johnson*, 132 F.3d 1069, 1075 (5th Cir. 1998).

---

[16]     And that question remains open. *See House v. Bell*, 126 S. Ct. at 2087.

First, the evidence Coleman presents is not "newly discovered." Coleman argues that the affidavits offered in support of her claims of ineffective assistance of trial counsel constitute new evidence of her innocence. That evidence, as discussed above, is not new. As Coleman's trial counsel explained in their affidavits, they interviewed Coleman's family (including Brown and Sharon) and made the strategic decision to not present their testimony. SHCR-01 at 231, 262.

But even if this Court could consider the "truly persuasive demonstration" language of *Herrera*, federal habeas relief under these circumstances would be available *only* "if there were no state avenue open to process such a claim." *Herrera*, 506 U.S. at 417; *see also Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003). First, the claim was properly raised,[17] but rejected, during the state habeas proceedings. Second, like all death-sentenced inmates, Coleman may still utilize the State's procedures for seeking executive clemency. *See* Tex. Crim. Proc. Code art. 48.01 (West 2001); *Lucas*, 132 F.3d at 1075. Thus, Coleman's free-standing claim of actual innocence must be denied. Regardless, as demonstrated below, Coleman is far from "actually innocent."

Challenges to sufficiency of the evidence are judged under the standards of *Jackson v. Virginia*, 443 U.S. 307 (1979). The *Jackson* standard asks

---

[17]      *See Ex parte Elizondo*, 947 S.W.2d 202, 205 (Tex. Crim. App. 1996).

"'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Hughes v. Johnson*, 191 F.3d 607, 619 (5th Cir. 1999) (quoting *Jackson*, 443 U.S. at 319). "[T]he standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16; *Hughes*, 191 F.3d at 619. If the evidence is sufficient to prove the substantive elements of the charge, then the standards of *Jackson* are met. *Brown v. Collins*, 937 F.2d 175, 182 (5th Cir. 1991). Even if state law imposes a more demanding standard, only the *Jackson* standard of sufficiency of the evidence need be satisfied. *Gilley v. Collins*, 968 F.2d 465, 468 (5th Cir. 1992). Thus, regardless of whether the facts of the case could hypothetically support the defendant's claim of innocence, if a rational trier of fact could have found the essential elements of a crime, beyond a reasonable doubt, then the evidence is sufficient to support a conviction under the *Jackson* standard. *Id.*

Under Texas law, an individual commits murder if she "intentionally or knowingly causes the death of an individual." Tex. Penal Code § 19.02(b)(1). That individual commits capital murder if she commits murder as just defined and, *e.g.*, she commits that murder during the commission of another felony, as in this case, kidnapping. Tex. Penal Code § 19.03(a)(2). A charge of kidnapping

requires the State to prove the defendant abducted another person, either by (1) secreting or holding the person in a place where the person is not likely to be found or (2) using or threatening to use deadly force. Tex. Penal Code § 20.01(2). The offense is completed when the defendant, at any time during the restraint of the victim, forms the intent to prevent liberation by secreting or holding another in a place where the person is unlikely to be found. *Brimage v. State*, 918 S.W.2d 466, 475-76 (Tex. Crim. App. 1994). Coleman argues that, in light of the "newly discovered" evidence, the evidence is insufficient to establish that she kidnapped Davontae because the evidence showed that Williams restrained Davontae, the restraint was not done in a manner that would cause serious bodily injury or death, and the restraint was done with Williams's consent. Pet. Memo at 63-64. As an initial matter, the Court of Criminal Appeals rejected each of these arguments, holding concluding that D.W.'s testimony and Coleman's admission established that Coleman used force to restrain Davontae and that Williams's acquiescence to the restraint was irrelevant. *Coleman v. State*, slip op. at 4-6. Those conclusions are clearly supported by the record, and therefore not objectively unreasonable. 28 U.S.C. § 2254(d)(2).

As to the specific allegations raised in the affidavits provided by Coleman, the state habeas court reviewed and court found that Coleman's trial counsel had interviewed Coleman's family and that none of the statements established

that she is actually innocent. SHCR-01 at 262-63. None of the "newly

discovered" evidence is credible and it is entirely inconsistent with the physical

evidence in this case. *Dowthitt*, 230 F.3d at 742.

Finally, and importantly, Coleman totally discounts the jury's role as the

sole arbiter of credibility:

> A fundamental premise of our criminal trial system is that "the jury
> is the lie detector." *United States v. Barnard*, 490 F.2d 907, 912
> [(9th Cir. 1973)]. Determining the weight and credibility of witness
> testimony, therefore, has long been held to be "part of every case
> [that] belongs to the jury, who are presumed to be fitted for it by
> their natural intelligence and their practical knowledge of men and
> the ways of men. *Aetna Life Ins. Co. v. Ward*, 140 U.S. 76, 88 []
> (1891).

*United States v. Scheffer*, 118 S. Ct. 1261, 1266 (1998). As the state habeas

court's conclusion finds ample support in the record so it cannot be objectively

unreasonable. 28 U.S.C. § 2254(d)(2). For these reasons, Coleman is not

entitled to federal habeas relief on this claim.

## IV.     Coleman's Claim That There Was Insufficient Evidence to Support the Jury's Affirmative Answer to the Future Dangerousness Special Issue Is Procedurally Barred and Without Merit.

The future dangerousness special issue asks the jury to determine whether

"from the evidence beyond a reasonable doubt [] there is a probability that the

defendant [] would commit criminal acts of violence that would constitute a

continuing threat to society?" Tex. Code Crim. Proc. art 37.071(b)(1); *see also* CR

794, 798. This question has not changed since it was first approved of in *Jurek v. Texas*, 428 U.S. 262, 274-75 (1976).

As an initial matter, this claim was procedurally barred during the state habeas proceedings because it mirrored one of Coleman's claims that was raised (and rejected) on direct appeal and because claims relating to the sufficiency of the evidence are not cognizable in habeas corpus. SHCR-01 at 264, 269. *Id.* at 264.[18] Consequently, the claim is procedurally barred in this Court. *Aguilar v. Dretke*, 428 F.3d 526, 535 (5th Cir. 2005). In any event, this claim is baseless.

Coleman challenges the sufficiency of the evidence supporting the jury's finding that the State had proven her future dangerousness beyond a reasonable doubt. Pet. Memo at 77-79. But as the state court found (and as Coleman seems to concede), the case for future dangerousness was more than sufficient.[19] In reviewing Coleman's second death sentence, the court first outlined the standard of review: "We must view all of the evidence in the light most favorable to the

---

[18]    And Coleman has made no attempt to establish either cause and prejudice or a fundamental miscarriage of justice, as she must, in order to avoid application of these bars. *See Coleman*, 501 U.S. at 750.

[19]    To the extent Coleman is alleging factual sufficiency, such is not cognizable on federal habeas review. Factual insufficiency is strictly a creation of Texas state law under which an appellate court examines the fact-finder's weighing of the evidence. Because this is strictly a state-law rule, it plays no part in a federal habeas court's evaluation of evidentiary sufficiency. *Pemberton v. Collins*, 991 F.2d 1218 (5th Cir. 1993); *Brown v. Collins*, 937 F.2d 175, 181 (5th Cir. 1991); *Schrader v. Whitley*, 904 F.2d 282, 284 (5th Cir. 1990); *Thompson v. Lynaugh*, 821 F.2d 1054, 1062 (5th Cir. 1987).

jury's finding and determine whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found beyond a reasonable doubt that the answer to the future-dangerousness issue was 'yes'." *Coleman*, slip op. at 12 (citing *Ladd v. State*, 3 S.W.3d 547, 557-58 (Tex. Crim. App. 1999)). The court then found the evidence to be sufficient because the evidence showed, *inter alia*, Coleman was found to have abused Davontae in 1999, Coleman admitted to beating him, D.W. testified that Coleman tied up and whipped Davontae with extension cords (and beat D.W. and her sister), Davontae's body had suffered 250 distinct injuries, and Davontae had been intentionally starved. *Id.*

On this record, the state court's determination is not objectively unreasonable. Coleman suggests nothing that undermines that rejection; she is therefore not entitled to federal habeas relief.

## V.    Colemans's Challenges to the Mitigation Special Issue Must be Denied.

Coleman argues that the mitigation special issue violated her rights under the Eighth and Fourteenth Amendments. Pet. Memo at 80-86. Specifically, Coleman argues that the mitigation special issue allows the jury too much discretion in assessing the death penalty and that it sends "mixed signals" to the jury. *Id.* The claims are procedurally barred and without merit.

These claims were procedurally barred during the state habeas proceedings because they mirrored Coleman's claims that were raised (and rejected) on direct appeal. SHCR-01 at 264, 269. *Id.* at 264.[20] Consequently, the claims are procedurally barred in this Court. *Aguilar v. Dretke*, 428 F.3d 526, 535 (5th Cir. 2005). In any event, both of the claims are baseless.

In Texas, the jury in a capital sentencing proceeding is charged with determining

> whether, taking into consider all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than death be imposed.

The jury is further instructed that it "need not agree on what particular evidence supports an affirmative finding on the issue," and that it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." Tex. Code Crim. Proc. art. 37.071 §§ 2(e)(1), 2(f)(3)-(4). Importantly, the Supreme Court has previously approved the mitigation special issue as currently worded. *See Penry II*, 532 U.S. at 803. For the reasons discussed below, Coleman's challenges to the mitigation special issue are baseless.

---

[20]    And Coleman has made no attempt to establish either cause and prejudice or a fundamental miscarriage of justice, as she must, in order to avoid application of these bars. *See Coleman*, 501 U.S. at 750.

The specific challenges Coleman presents have been rejected. The Supreme Court and Fifth Circuit have held that a mitigation instruction does not violate the Eighth and Fourteenth Amendments because it allows the jury too much discretion in assessing the death penalty. *Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994)(the jury "may be given unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty."); *Moore v. Johnson*, 225 F.3d 495, 506-07 (5th Cir. 2000); *see Johnson v. Cockrell*, 306 F.3d 249, 256 (5th Cir. 2002); *Adams v. Thaler*, 421 Fed. Appx. 322, 337 (5th Cir., March 31, 2011)(unpublished). Similarly, the claim that Texas's mitigation instruction is unconstitutional because it sends "mixed signals" has been roundly rejected.[21] *Scheanette v. Quarterman*, 482 F.3d 815, 824-27 (5th Cir. 2007); *Foster v. Thaler*, 369 Fed. Appx. 598, 606 (5th Cir. 2010)(unpublished); *Oliver v. Quarterman*, 254 Fed. Appx. 381, 385-86 (5th Cir. 2007); *Manns v. Quarterman*, 236 Fed. Appx. 908, 911-12 (5th Cir. 2007)(unpublished). Coleman

---

[21]    The statute in effect at the time of Penry's trial did not contain the current mitigation special issue. *See Penry II*, 532 U.S. at 786. Thus the jury was instructed, "[i]f you find that there are any mitigating circumstances in this case, you must decided how much weight they deserve, if any, and therefore, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative find to the issue under consideration, rather than a death sentence, is an appropriate response to the personal moral culpability of the defendant, a negative finding should be given to one of the special issues." *Id.* at 797-98.

argues that under the rationale of *Penry II* the current mitigation special issue violates the Eighth Amendment because it sends "mixed signals" to the jury. Specifically, she asserts that the failure to specifically assign the State the burden of proving a negative answer to this issue necessarily leads to confusion among the jurors regarding how to respond to this issue. However, this argument is unavailing.

A careful reading of *Penry II* does not support Coleman's argument. Unlike the "nullification instruction" submitted to Penry's jury, neither the mitigation special issue nor the instructions that accompanied it rendered the jury charge "internally contradictory" by making it legally and ethically impossible to follow all of the instructions given. In this case, the jury was asked to consider whether

> [t]aking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

CR 795. The jury was further instructed that "the jury need not agree on what particular evidence supports an affirmative finding on Special Issue Number 3," and that mitigating evidence was that which "a juror might regard as reducing the defendant's moral blameworthiness." CR 796. These instructions provide clear guidance to the jury in how to respond to the mitigation special issue.

Further, nothing in these instructions conflicts with those given relating to the other special issues. Thus, *Penry II* is inapposite here.

Furthermore, the Eighth Amendment does not bar a state from imposing the burden of proof on the defendant to "establish, by a preponderance of the evidence, the existence of mitigating circumstances sufficiently substantial to call for leniency." *See Walton v. Arizona*, 497 U.S. 639, 649-51 (1991). And the Supreme Court has never required that juries in capital cases be instructed that the State must disprove the existence of mitigating circumstances. *See Woods v. Cockrell*, 307 F.3d 353, 359 (5th Cir. 2002). Accordingly, even if the jury assumed that Coleman had the burden of proving an affirmative answer to the mitigation special issue beyond a reasonable doubt, such a result does not offend the Eighth Amendment.

Coleman has not demonstrated that the state court's decision to deny relief on her challenges to the Texas mitigation instruction was unreasonable. The claims should, therefore, be denied.

## VI.   Coleman Is Not Entitled to an Evidentiary Hearing in Federal Court.

When a federal court evaluates a state-court decision under § 2254(d)(1), that review

> is limited to the record that was before the state court that
> adjudicated the claim on the merits. Section 2254(d)(1) refers, in
> the past tense, to a state-court decision that 'resulted in' a decision
> that was contrary to, or 'involved' an unreasonable application of,

established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at the same time *i.e.*, the record before the state court.

*Pinholster*, 131 S. Ct. at 1398. The Supreme Court held that "evidence introduced in federal court has no bearing on a § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petition must overcome the limitation of § 2254(d)(1) on the record that was before the state court." *Id.* at 1400.[22] In such instance, a federal habeas court is prohibited from considering new evidence or granting an evidentiary hearing.[23] For claims that were not adjudicated on the merits, a federal court's discretion to consider new evidence is restricted by § 2254(e)(2). *Pinholster*, 131 S. Ct. at 1401 (citing *(Michael) Williams v. Taylor*, 529 U.S. at 431-32.

In the wake of *Pinholster*, for Coleman to be entitled to a federal evidentiary hearing, she must show that her claims were not adjudicated on the

---

[22]    It would be contrary to § 2254(b)'s purpose—that state courts have primary responsibility to review federal-law challenges to a state custodial judgment and provide any necessary relief—if petitioners were allowed "to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively de novo." *Pinholster*, 131 S. Ct. at 1398-99 (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997), and *Woodford v. Viscotti*, 537 U.S. 19, 27 (2002) (per curiam)).

[23]    Rejecting Pinholster's contention that its holding would render 28 U.S.C. § 2254(e)(2) superfluous, the Supreme Court reasoned: "Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief. For example, not all federal habeas claims by state prisoners fall within the scope of § 2254(d), which applies only to claims 'adjudicated on the merits in State court proceedings.'" *Pinholster*, 131 S. Ct. at 1401 (emphasis added).

merits in state court;   that her claims either satisfy § 2254(e)(2) or else fall outside (e)(2)'s opening clause;   and that an evidentiary hearing could enable Coleman to prove the petition's factual allegations, which, if true, would entitle her to federal habeas relief.[24]   Even if Coleman meets this standard, the Court has discretion to deny a hearing if sufficient facts exist to make an informed decision on the merits. *Clark*, 227 F.3d at 284-85.

The Court is prohibited from granting an evidentiary hearing on Coleman's claims.  As argued above, while some claims were rejected by the state habeas court on procedural grounds, all of the claims were also rejected on the merits.  As a result, this Court's review under § 2254(d)(1) is limited to the record before the state court, and an evidentiary hearing is prohibited. *Pinholster*, 131 S. Ct. at 1398.

## CONCLUSION

For the foregoing reasons, the State respectfully requests that this Court deny Coleman's petition for federal habeas relief.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

---

[24]   *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.").

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division

*Lead Counsel

JAY CLENDENIN*
State Bar No. 24059589
Assistant Attorney General

P.O. Box 12548, Capitol Station
Austin, Texas 78711
Telephone: (512) 936-1400
Facsimile No.: (512) 936-1280
Email: Jay.Clendenin@oag.state.tx.us

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the foregoing motion will

be served by placing same in the United States mail, postage prepaid, on the

21st day of December, 2011, addressed to :

John W. Stickels
Stickels & Associates, P.C.
P.O. Box 121431
Arlington, TX 76012

JAY CLENDENIN
Assistant Attorney General