

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| LISA ANN COLEMAN, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | NO. 4:11-CV-542-A |
| | § | |
| RICK THALER, DIRECTOR, | § | |
| TEXAS DEPARTMENT OF CRIMINAL | § | |
| JUSTICE, CORRECTIONAL | § | |
| INSTITUTIONS DIVISION, | § | |
| | § | |
| Respondent. | § | |

MEMORANDUM OPINION
and
ORDER

Before the court for decision is the petition of Lisa Ann

Coleman ("petitioner")[1] for a writ of habeas corpus pursuant to

the authority of 28 U.S.C. § 2254 by a person in state custody.

After having considered such petition, as amended, the answer

thereto of respondent, Rick Thaler, Director, Texas Department of

Criminal Justice, Correctional Institutions Division,

---

[1]In the state court habeas corpus papers Lisa Ann Coleman was referred to as the "applicant" and her request for state habeas relief was referred to as an "application." The approved form she filed for the request for habeas relief now under consideration referred to her as "petitioner" and her request for relief as a "petition." She referred to herself as "applicant" in her memorandum of law in support of her request. Respondent referred to her as "petitioner" in his answer to her request. Undoubtedly the confusion results from the fact that 28 U.S.C. § 2254 uniformly refers to a request for federal habeas relief as an "application" and to the person making the request as an "applicant," yet the Rules Governing Section 2254 Cases in the United States District Court uniformly refer to a request for relief filed under § 2254 as a "petition" and to the person filing such a request as a "petitioner." In this memorandum opinion, Ms. Coleman usually is referred to as "petitioner," but she is referred to as "applicant" in quotations taken from the state habeas record or from her memorandum of law filed in this court.

petitioner's reply, the state court trial and habeas records, and applicable legal authority, the court has concluded that the relief sought by such petition should be denied.

I.

Background

Petitioner was charged by an indictment filed March 29, 2006,[2] with two counts of injury to a child, Davontae Williams ("Davontae"), and one count of capital murder arising from the child's death.  On June 19, 2006, a jury returned a verdict convicting petitioner of capital murder.[3]  Based on the jury's answers at the punishment phase to special issues in the form prescribed by sections 2(b) and (e) of Article 37.071 of the Texas Code of Criminal Procedure, the judge of the District Court of Tarrant County, Texas, 297th Judicial District, sentenced petitioner to death.  Upon the automatic appeal to the Texas Court of Criminal Appeals of the capital murder conviction and death sentence, the Court of Criminal Appeals on December 9,

---

[2]The March 29, 2006 indictment was a re-indictment, replacing one that had been filed July 30, 2004.

[3]One of the injury-to-a-child counts was severed in April 2006.  The same jury that found petitioner guilty of capital murder also convicted petitioner of the other injury-to-a-child count, and assessed a ninety-nine year sentence as punishment for that offense.  Because of the Texas rule that appeals of noncapital convictions, even when obtained in the same trial as a conviction for which the death penalty was assessed, are properly reviewed by the intermediate court of appeals on direct appeal, see Callins v. State, 726 S.W.2d 555, 558 (Tex. Crim. App. 1986), the Court of Criminal Appeals dismissed petitioner's claims related to her injury-to-a-child conviction and sentence.

2009, affirmed the conviction and sentence.  Petitioner timely
sought writ of certiorari.  Her petition was denied by the
Supreme Court on October 4, 2010.

As related by the Court of Criminal Appeals in its December
9, 2009, opinion, the trial evidence that led to the capital
murder conviction was as follows:

> On July 26, 2004, Marcella Williams, Coleman's
> lover, found her nine-year-old son Davontae unconscious
> and called 911.  While en route to Williams's
> apartment, firefighter and paramedic Troy Brooks stated
> that the dispatcher changed the call from "breathing
> difficulty" to "full arrest."  When he arrived,
> Davontae was lying on the bathroom floor clad in a
> disposable diaper.  Brooks testified that Davontae
> appeared "emaciated" and looked as if he was only three
> to five years old.  Brooks immediately realized that
> Davontae was dead; his body was already in full rigor
> mortis, which usually occurs several hours after death.
> This "shock[ed]" Brooks because Williams had told him
> that Davontae had just eaten and thrown up and that
> Williams and Coleman had been washing him.  Brooks also
> noticed that Davontae had a few "dirty bandages" on his
> arms.  Vanessa Sheriff, a paramedic, testified that
> Williams told her that she tried to feed Davontae
> Pediasure.  Williams also said that Davontae was
> breathing when she called 911.  Sheriff believed this
> statement "did not match with what [she saw] on the
> bathroom floor."  Both Brooks and Sheriff noticed that
> Davontae had traces of yellow vomit or bile around his
> mouth and nose.  Sheriff believed that the appearance
> of vomit was consistent with the liquid Pediasure.
>
> Dr. Daniel Konzelmann conducted the autopsy.  Dr.
> Konzelmann determined that Davontae's death was a
> homicide and that the direct cause of death was
> malnutrition coupled with slight pneumonia.  Davontae
> weighed less than forty pounds at the time of his
> death.  Dr. Konzelmann determined that Davontae was
> malnourished because Davontae's body lacked

subcutaneous fat cells.  He also cited the lack of fat
cells surrounding Davontae's heart as very unusual.
Dr. Konzelmann also explained how the  external
injuries to Davontae's body contributed to his death:

> I believe that some of these injuries were
> infected and that it's possible that this did
> relate to the pneumonia that he had.  Also
> some of these were evidence to me that he had
> been bound and that this would have prevented
> him from either seeking care on his own or
> getting food on his own.

> . . .

> Malnutrition will depress the immune system.
> That is, there are cells in the body that are
> designed to recognize invaders and deal with
> them, and that takes energy.  As someone
> becomes more malnourished, their system is
> less able to  protect themselves.

Dr. Konzelmann noted evidence indicating that
Davontae had been continuously bound.  Davontae had
numerous linear marks on his wrists.  Some of the marks
were scarred, indicating wounds that had healed, and
some of the marks were "giant sores[s]," indicating
that they were not healing.  This demonstrated a
pattern of restraint.  Davontae's ankles had similar
markings. Davontae's ear had a significant wound that
was beginning to heal.  His lower lip had an ulceration
and a tear that would make it hard for Davontae to eat
and drink.  It appeared that Davontae had chicken-
noodle soup before he died but, according to Dr.
Konzelmann, "it was inadequate, too late, and possibly
too much."

Dr. Nancy Kellogg, a board-certified pediatrician
and specialist in child abuse, identified at least 250
distinct injuries to Davontae, including cigarette or
cigar burn wounds and numerous ligature marks on his
arms and legs.  Kellogg described the starvation of a
child as "very rare" and "unusual."  However, based on
the ligature marks, she concluded that Davontae was
intentionally starved to death.  Davontae had been

restrained from accessing food.  Based on a review of
Davontae's medical records from December 2002, Dr.
Kellogg opined that Davontae had a "normal growth
velocity" for a child his age.  This indicated that he
did not suffer from a disease that would stunt his
growth.  In the months before his death, however,
Davontae's weight spiked downward and he stopped
growing.  The physical stress caused Davontae's hair
growth to be abnormal; he had hair growing in places
where hair does not normally grow.  Such growth is
typically seen in people who are anorexic.

Detective Jim Ford questioned Coleman while
investigating Davontae's death.  Coleman told Detective
Ford that she lived with Williams about half of the
time and with her son and mother the other half.  She
used to beat Davontae with a belt but stopped in
February or March of 2004 because the beatings left
welts.  She stated that she and Williams tied up
Davontae on several occasions.  Recalling the night
that Davontae died, Coleman stated that Williams woke
her up screaming.  Williams attempted to administer CPR
to Davontae, and Coleman said that she put Davontae in
a warm bath to revive him. Coleman did not know how
Davontae injured his arms and legs.

Davontae's sister, [D.W.],[4] who was eight at the
time, testified that Coleman would tie Davontae up with
an extension cord in the bathroom.  When Davontae was
tied up, he "couldn't move around much" and did
"[n]othing."

Child Protective Service (CPS) Investigators
Jennifer Deible and Edna Campbell testified that
Davontae was removed from Williams's home and placed in
foster care in 1999 because Coleman physically abused
him.  Davontae was returned to Williams's custody about
a year later.  After her arrest in this case, Coleman
told the two that she bruised Davontae by beating him
with a belt in 2004.  She spoke to her mother about the
incident, and her mother told her to not to touch
Davontae.  She admitted that she tied up Davontae on

---

[4]Davontae's sister, who testified at Coleman's trial, will be referred to by her initials, D.W.

two occasions with clothing to keep him from hurting
himself or others.  According to Campbell, Coleman said
that Williams did not want to take Davontae to the
doctor because she was afraid that the bruises and
marks would prompt a doctor to call CPS.  Coleman
admitted to Campbell that she had hit and pushed
Davontae, causing him to split his lip.  She also told
Campbell that Williams did not want Davontae to go to
school because Williams was afraid that he would report
the abuse and that school officials would call CPS.
Coleman stated that Davontae had been tied up regularly
since June and that the sore on his arm was caused by
him fighting to be released.  The pantry door had a
lock on the top of the door frame, and investigators
discovered a dry urine stain on the floor.  But Coleman
denied locking Davontae in the pantry.  Coleman also
said that Davontae had been sick for about a month
before his death.  He did not eat very much when fed,
and he would throw up.  Coleman stated that, in an
attempt to help Davontae, she and Williams gave him a
variety of over-the-counter medicines.

Dr. Lesther Winkler, a pathologist, testified for
the defense.  He stated that Davontae died from
aspiration pneumonia, which "is the result of sucking
food or particles of material which don't go into the
stomach properly through the esophagus and are sucked
instead into the trachea," which leads to the lungs.
Dr. Winkler noted aspirated material in Davontae's lung
and that his right lung was twice the size of his left
because of the aspirated material.  Dr. Winkler
disagreed with Dr. Konzelmann's determination that the
absence of fat around Davontae's heart was significant.
In his opinion, children rarely have fat around the
heart.  As for the malnutrition, Dr. Winkler agreed
that Davontae was malnourished; there was no evidence
that Davontae was unable to metabolize food.  Dr. Nizam
Peerwani, the Chief Medical Examiner with Tarrant
County, also examined Davontae's body during the
autopsy.  The State called him to testify to rebut Dr.
Winkler's testimony.  He stated that a normal person
does not aspirate and die and that there was no reason
to suggest that Davontae aspirated given his medical
history.  Viewing the "entire picture," Dr. Peerwani
stated, "even if he had aspirated, the pneumonia is not

a very significant component in this child's death.
Perhaps the most dramatic component is malnourishment
... He died because of malnutrition."

Coleman v. State, No. AP-75,478, 2009 WL 4696064, *1-3 (Tex.

Crim. App. Dec. 9, 2009) (footnote added).

And, the Court of Criminal Appeals summarized the evidence

received at the punishment phase of the trial as follows:

> CPS records show that Coleman was involved with
> the  Williams family as early as 1995.  In 1999,
> Coleman was the subject of a CPS abuse case involving
> Davontae.  Davontae was removed from the home at that
> time because he was being abused by Coleman and his
> mother failed to protect him from the abuse.  Davontae
> was returned to the family home only when Williams
> agreed not to let Coleman live in the home and CPS
> caseworkers were certain that Coleman was not living in
> the home.  CPS records indicated, however, that at the
> time of Davontae's death, Coleman lived in the home
> more than fifty percent of the time and was considered
> by CPS as a care giver.

> Coleman admitted to CPS investigators that she had
> pushed and hit Davontae, causing him to fall and split
> his lip, but she insisted that she had not beaten
> Davontae since February 2004.  Coleman's own mother had
> told Coleman to leave Davontae alone, and her sister
> had advised her to get help for Davontae.  Coleman also
> admitted to tying up Davontae with clothing at least
> twice, but insisted that it was for his own protection
> because he wandered at night.  Davontae's sister,
> [D.W.], told the jury that Coleman kept Davontae tied
> up in the bathroom and whipped him with extension
> cords.  [D.W.] also told the jury that Coleman beat her
> and her sister with belts, clothes hangers, and
> extension cords as well.

> Dr. Kellogg identified 250 distinct injuries
> suffered by Davontae, including cigar or cigarette
> burns and ligature marks on his arms and legs, many of
> which were old enough to have formed scars.  Dr.

Konzelmann testified about a significant injury to
Davontae's lip that would have, before it healed, made
it difficult for him to eat and nearly impossible to
drink.  Davontae also had a deformity to one of his
ears that was caused by long-term traumatic injury and
ligature scarring on his penis caused by attempts to
prevent Davontae from wetting his bed.

     And as shown above, there was ample evidence of
intentional starvation.  Davontae had been healthy and
growing in 1999; his starvation was not based on
metabolic factors.  The presence of depleted fat cells
showed that he had received adequate nutrition at some
time.  Dr. Kellogg testified that there was no food
matter in Davontae's system beyond his stomach,
indicating that he had not eaten regularly.  The jury
heard from Dr. Kellogg that Davontae's death occurred
over a number of months.

     The jury also heard from Carol Bowdry, Coleman's
own expert, that Davontae's injuries were torturous.
Bowdry agreed on cross-examination that Coleman
systematically and chronically abused Davontae.  She
testified that Davontae "went through agony."  Bowdry
also testified that abusers such as Coleman "may intend
for the child to go through an awful lot of pain and
suffering," but are surprised when a child dies from
the abuse.  Coleman's second expert, Dr. Mary Connell,
testified on cross-examination that even someone like
Coleman who suffered abuse as a child would know that
the systematic abuse of Davontae was wrong.

     The State presented evidence of Coleman's prior
felony convictions for burglary of a habitation and
possession of a controlled substance.  On cross-
examination, defense expert Dr. Paula Lundberg-Love
admitted that Coleman had revealed to her a conviction
for unlawfully carrying a weapon when she was seventeen
in 1993, an arrest for evading arrest in 1995, and a

parole violation in 1997 that resulted in her return to prison.

Id. at *12-13.

On May 4, 2008, petitioner filed a state court application for writ of habeas corpus, which was denied by order dated August 25, 2010, of the Texas Court of Criminal Appeals. Petitioner's federal petition for writ of habeas corpus, which is now under consideration, was filed September 23, 2011, and, with leave of court, was amended October 3, 2011. Respondent filed his answer to the petition on December 22, 2011. Petitioner filed her reply on January 20, 2012.

II.

### Claims for Relief Asserted by Petitioner

The seven claims for relief asserted by petitioner in the habeas petition under consideration are as follows:

**CLAIM FOR RELIEF NUMBER ONE:**

APPLICANT'S SIXTH AMENDMENT RIGHT TO COUNSEL WAS VIOLATED WHEN SHE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AS A RESULT OF HER LEGAL TEAM'S FAILURE TO ADEQUATELY INVESTIGATE THE FACTS OF THIS CASE AS REQUIRED BY *STRICKLAND V. WASHINGTON*, 466 U.S. 668 (1984) AND AS REQUIRED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U. S. CONSTITUTION.

**CLAIM FOR RELIEF NUMBER TWO:**

APPLICANT'S SIXTH AMENDMENT RIGHT TO COUNSEL WAS VIOLATED WHEN SHE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AS A RESULT OF HER LEGAL TEAM'S FAILURE TO ADEQUATELY INVESTIGATE AND PRESENT MITIGATION EVIDENCE

AS REQUIRED BY *WIGGINS V. SMITH,* (123 S.CT. 2527 (2003)) AND *LEWIS V. DRETKE,* 355 F.3D 364 (5TH CIR. 2003) AND AS REQUIRED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U. S. CONSTITUTION.

**CLAIM FOR RELIEF NUMBER THREE:**

APPLICANT HAS BEEN DENIED HER RIGHT TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE U. S. CONSTITUTION AS SHE IS INCARCERATED AND FACES EXECUTION FOR AN OFFENSE FOR WHICH SHE IS ACTUALLY INNOCENT.

**CLAIM FOR RELIEF NUMBER FOUR:**

APPLICANT'S SIXTH AMENDMENT RIGHT TO COUNSEL AS REQUIRED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U. S. CONSTITUTION WAS VIOLATED WHEN SHE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AS A RESULT OF APPELLATE COUNSEL'S FAILURE TO ALLOW HER CONVICTION FOR INJURY TO A CHILD TO BECOME FINAL PRIOR TO HER CONVICTION FOR CAPITAL MURDER BECOMING FINAL.

**CLAIM FOR RELIEF NUMBER FIVE:**

APPLICANT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO BE FREE FROM A WHOLLY ARBITRARY DEPRIVATION OF LIBERTY AND EIGHTH AMENDMENT RIGHT TO BE FREE FROM THE ARBITRARY AND CAPRICIOUS INFLICTION OF THE DEATH PENALTY WERE VIOLATED BECAUSE THE EVIDENCE ADDUCED AT TRIAL WAS LEGALLY INSUFFICIENT TO SUPPORT THE JURY'S ANSWER TO THE FUTURE DANGEROUSNESS SPECIAL ISSUE.

**CLAIM FOR RELIEF NUMBER SIX:**

APPLICANT'S FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS AND EIGHTH AMENDMENT RIGHT TO BE FREE FROM THE ARBITRARY AND CAPRICIOUS INFLICTION OF THE DEATH PENALTY WERE VIOLATED BECAUSE THE STATUTE UNDER WHICH APPLICANT WAS SENTENCED TO DEATH ALLOWS THE JURY TOO MUCH DISCRETION TO DETERMINE WHO SHOULD LIVE AND WHO SHOULD DIE AND BECAUSE IT LACKS THE MINIMAL STANDARDS AND GUIDANCE NECESSARY FOR THE JURY TO AVOID THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY.

**CLAIM FOR RELIEF NUMBER SEVEN:**

APPLICANT'S FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS
AND EIGHTH AMENDMENT RIGHTS AS INTERPRETED IN *PENRY V
JOHNSON* WERE VIOLATED BECAUSE THE MITIGATION SPECIAL
ISSUE SET FORTH IN THE TEXAS DEATH PENALTY STATUTE
SENDS MIXED SIGNALS TO THE JURY THEREBY RENDERING ANY
VERDICT REACHED IN RESPONSE TO THAT SPECIAL ISSUE
INTOLERABLY UNRELIABLE.

Mem. in Supp. of Pet. at 2-4.

### III.

### Standards Applicable to the Relief
### Sought by the Petition

A.   General Standards

In pertinent part, 28 U.S.C. § 2254 provides that the only

ground for relief thereunder is that the petitioner "is in

custody in violation of the Constitution or laws or treaties of

the United States."  28 U.S.C. § 2254(a).  A petition brought

under § 2254

shall not be granted with respect to any claim that was
adjudicated on the merits in State court proceedings
unless the adjudication of the claim—

(1) resulted in a decision that was contrary to,
or involved an unreasonable application of,
clearly established Federal law, as determined by
the Supreme Court of the United States; or

(2) resulted in a decision that was based on an
unreasonable determination of the facts in light

of the evidence presented in the State court
proceeding.

28 U.S.C. § 2254(d).[5]

A decision is contrary to clearly established federal law if
the state court arrives at a conclusion opposite to that reached
by the Supreme Court of the United States on a question of law or
if the state court decides a case differently than the Supreme
Court has on a set of materially indistinguishable facts.
Williams v. Taylor, 529 U.S. 362, 405-06 (2000); see also Hill v.
Johnson, 210 F.3d 481, 485 (5th Cir. 2000). A state court
decision will be an unreasonable application of clearly
established federal law if it correctly identifies the applicable
rule but applies it unreasonably to the facts of the case.
Williams, 529 U.S. at 407-08.

In a § 2254 proceeding such as this, "a determination of
factual issue made by a State court shall be presumed to be
correct" and the petitioner "shall have the burden of rebutting
the presumption of correctness by clear and convincing evidence."
28 U.S.C. § 2254(e)(1). A federal court may assume the state

---

[5]Petitioner devotes a subsection of her memorandum of law in support of her petition to the
proposition that 28 U.S.C. § 2254(d) violates the separation of powers and that the court should instead
review the decision of the state court for constitutional error. Mem. in Supp. of Pet. at 6-12. Respondent
devotes a footnote in his answer as a response to that contention. Answer at 3, n.2. The court does not
need to address that proposition in order to decide the case in favor of respondent. The court would note
that it is not persuaded by any argument or authority contained in petitioner's memorandum that her
separation-of-powers theory has merit.

12

court applied correct standards of federal law to the facts,

unless there is evidence that an incorrect standard was applied.

Townsend v. Sain, 372 U.S. 293, 314 (1963)[6]; Catalan v. Cockrell,

315 F.3d 491, 493 n.3 (5th Cir. 2002).

B.    Ineffective Assistance of Counsel

A criminal defendant has a constitutional right to the

effective assistance of counsel at trial.   U.S. CONST. amends. VI,

XIV; Strickland v. Washington, 466 U.S. 668, 685-86 (1984).   An

ineffective assistance claim is governed by the familiar

standards set forth in Strickland.   In order to prevail on an

ineffective assistance of counsel ground, petitioner must show,

first, that her counsel's performance was deficient, i.e., that

her counsel made errors so serious that counsel was not

functioning as the "counsel" guaranteed to petitioner by the

Sixth Amendment, and, second, that the deficient performance

prejudiced her defense, i.e., that her counsel's errors were so

serious as to deprive her of a fair trial, a trial whose result

is reliable.   Id. at 687.   The proper standard for measuring the

attorney's performance is that of reasonably effective

assistance.    Id.

---

[6]The standards of Townsend v. Sain have been incorporated into 28 U.S.C. § 2254(d).  Harris v. Oliver, 645 F.2d 327, 330 n.2 (5th Cir. 1981).

Both prongs of the Strickland test must be met to demonstrate ineffective assistance. Id. at 687. To establish the first prong, petitioner must overcome a strong presumption that her counsel's conduct falls within the wide range of reasonable professional assistance or sound trial strategy. Id. at 689. It is not enough to show that some, or even most, defense lawyers would have handled the case differently. Green v. Lynaugh, 868 F.2d 176, 178 (5th Cir. 1989). For the second prong, petitioner must show that her counsel's errors were so serious as to "deprive [her] of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687.

A claim of ineffective appellate counsel is evaluated by the Strickland standard. Smith v. Robbins, 528 U.S. 259, 285-87 (2000). The petitioner must first show that her appellate counsel was objectively unreasonable, and then she has the burden of demonstrating prejudice.

Where a petitioner's ineffective assistance claims have been reviewed on their merits and denied by the state courts, federal habeas relief will be granted only if the state courts' decision was contrary to or involved an unreasonable application of the standards set forth in Strickland. See Bell v. Cone, 535 U.S. 685, 698-99 (2002); Santellan v. Dretke, 271 F.3d 190, 198 (5th Cir. 2001).

14

IV.

Analysis

The court has concluded that there is no need for a hearing, and that all of petitioner's claims for relief can be resolved on the basis of the state court record and the filings by the parties in this action.[7]  Therefore, the court is denying the requests for hearing made by petitioner, including the motion she filed January 20, 2012.  The court takes up, and discusses, petitioner's claims for relief, as set forth in section II above, in numerical sequence.

A.    Claim for Relief Number One

Petitioner summarized the factual and legal basis of her Claim for Relief Number One as follows:

> Ms. Coleman's legal team failed to adequately investigate and present guilt/innocence evidence related to the kidnapping allegation contained in the indictment.  As a result, Applicant was prevented from presenting a defense to the kidnapping allegation. Specifically, Applicant's legal team failed to interview Tonya Coleman Brown, Sharon Coleman, and Marcella Williams.  Because of these failures, Applicant's legal team was not able to present a defense to the 'kidnapping' element of the capital murder charge.  These failures resulted in a violation

---

[7]Respondent responded to petitioner's initial request for hearing in section VI of his answer. Answer at 55-57.  Essentially for the reasons given by respondent, petitioner is not entitled to a hearing in this court. The court would add that the procedural history that is discussed below discloses that the state court, in effect, had two evidentiary hearings on affidavits. Petitioner did not tender any evidentiary material in state court that was not taken into consideration by the state court in its adjudications against petitioner. Nor has petitioner presented anything in this court that would suggest that anything meaningful would be accomplished by a further hearing on the grounds of her petition.

of Applicant's Sixth Amendment Rights to effective
assistance of counsel and require that she be given a
new trial.

Mem. in Supp. of Pet. at 23.

According to petitioner, had her trial counsel presented the

testimony of Tonya Coleman Brown ("Tonya"), Sharon Coleman

("Sharon"), and Marcella Williams ("Williams"), they would have

convinced the jury that petitioner did not kidnap Davontae, thus

negating the capital murder charge.[8]  Petitioner's first ground

for relief in her state court habeas application was essentially

the same as her Claim for Relief Number One in the habeas

petition under consideration.  In support of this ground for

relief, petitioner included as exhibits to her state habeas

application affidavits of Tonya and Sharon and an unsworn

declaration of Williams.

---

[8]The state court's instructions to the jury as to the kidnapping aspect of the capital murder count
were, in pertinent part, as follows:

> Our law provides that a person commits the offense of kidnapping if he
> intentionally or knowingly abducts another person.
>
> "Abduct" means to restrain a person with intent to prevent his liberation by
> secreting or holding him in a place where he is not likely to be found or using or
> threatening to use deadly force.
>
> "Deadly force" means force that is intended or known by the actor to cause, or in
> the manner of its use and intended use is capable of causing, death or serious bodily
> injury.
>
> "Restrain" means to restrict a person's movements without consent, so as to
> interfere substantially with the person's liberty, by moving the person from one place to
> another or by confining the person.
>
> "Restraint is "without consent" if it is accomplished by force, intimidation, or
> deception.

Clerk's Habeas R. at 162-63.

Tonya's affidavit, which was made on April 30, 2008,

recited, in pertinent part, that:

> I am the Aunt of Lisa Ann Coleman.  During the
> months leading up to July 26, 2004, I visited in the
> home of Lisa Ann Coleman and Marcella Williams
> approximately one or two times a month.  When I visited
> with Lisa and Marcella, I constantly saw Davontae
> Williams playing with other children, running around,
> and acting like a normal child.  I never saw Davontae
> restrained or tied up in any manner whatsoever.  In
> addition, every time I saw Davontae he appeared to be
> in good health.
>
> I was never contacted by Lisa Coleman's lawyers or
> any other person prior to Lisa's trial.  If I had been
> contacted, I would have related these facts to that
> person and been·ready and able to testify to the facts
> stated herein.

Clerk's Habeas R. at 122.  Sharon's affidavit, which was made

April 30, 2008, recited, in pertinent part that:

> My name is Sharon Coleman.  I reside at 509 S.
> Edgewood Terrace, Apt. 231, Fort Worth, Tarrant County,
> Texas.  My date of birth is August 5, 1986.  I have
> personal knowledge of the facts stated herein and they
> are true and correct.
>
> I am the sister of Lisa Ann Coleman.  During the
> months leading up to July 26, 2004, I lived about eight
> apartments away from Lisa Coleman and Marcella Williams
> and visited in their home on a daily basis.  During
> this time, I constantly saw Davontae Williams playing
> outside with other children.  I also saw Davontae
> playing outside in various places such as the park and
> the playground with his sisters and other children from
> the neighborhood.  I constantly saw Devontae [sic]
> running around and acting like a normal child.  I would
> often sit outside my door and watch Davontae play, run
> around, and act like a normal child.  I remember many
> times that neighbor children would go to Davontae's
> apartment and he would go outside and play with them.

During all the time I spent at the home of Lisa Coleman
and Marcella Williams, I never saw Davontae restrained
or tied up in any manner whatsoever.  In addition,
every time I saw Davontae he appeared to be in good
health.

I was never contacted by Lisa Coleman's lawyers or
any other person prior to Lisa's trial.  If I had been
contacted, I would have related these facts to that
person and been ready and able to testify to the facts
stated herein.

Id. at 124.  In pertinent part, the following recitations were in

the Williams unsworn declaration:

Davontae Williams was my son.  At the time of
Davontae's death, I lived in Apt. 2b of the Arbor
Apartments in Arlington, Texas, with Davontae,
Destinee, Alisha, Lisa Coleman, and Dontrell Coleman.
We all lived at the apartment for 7-8 months.

I found Davontae dead on the morning of July 26, 2004.
When I found him, he was still warm and I thought that
he had just died.  Davontae was in his bed, alone, when
I found him dead.  We, Davontae, Destinee, Alisha,
Lisa, and I, were all together in the same room but
Davontae was sleeping alone in his bed.  Davontae was
not restrained or tied up in any way whatsoever while
he was sleeping.

Davontae went to bed about 7:00 p.m. the nite [sic]
before, July 25, 2004.  When he went to bed that nite
[sic], he was not restrained or tied up.

The day before, July 25, 2004, Davontae was very sick.
He was throwing up and was in and out of the bathroom
during the day.  On July 25, 2004, Davontae was
restrained for about 10 minutes because he was getting
into stuff while we were getting ready.  Sometime
during  the day on July 25, 2004, all of us, including
Davontae, went to Lisa's mother's apartment about 2
buildings down from us for about an hour.  When we were
there, Davontae was playing with other children.

18

> We kept Davontae restrained from time to time from 10
> minutes to a couple of hours.  Davontae was never
> restrained for more than half a day.  Most of the time,
> Davontae was restrained while we were asleep to keep
> him from getting into stuff that would hurt him.
>
> While we lived at the Arbor Apartments, Davontae would
> constantly go outside and play with his sisters,
> Dontrell, and other children from the neighborhood.
>
> Davontae would go outside to play with other children
> as often as 3 to 4 times a week.  He would go to the
> part accross [sic] the street and play with kids from
> the neighborhood.
>
> Neither Lisa nor I ever intended to hide or secrete
> Davontae from any person.  We always let Davontae loose
> after we restrained him and we never restrained him for
> more than half a day.
>
> I was Davontae's mother.  When he was restrained it was
> because that was the only way I knew how to keep him
> out of stuff.  Any restraint was done with my
> permission or at my direction.

Id. at 126-28.

After having reviewed petitioner's state habeas application,

its exhibits, and the State's reply thereto, the state trial

court concluded that a hearing should be held by way of

affidavits and other documentary evidence on her ineffective-

assistance-of-counsel grounds.  Id. at 222-24.  Michael Heiskell

("Heiskell") and Fred Cummings ("Cummings"), who represented

petitioner at her trial, filed affidavits in response to the

order.  Nothing in Heiskell's affidavit was pertinent to

petitioner's complaints that her trial counsel should have used

Tonya, Sharon, and Williams as trial witnesses other than the
statements that:

> [W]e moved forward in presenting the best defense that
> we could under the circumstances.  In the course of
> said presentation, we received very little assistance
> from the family of Lisa, who seemed to want to distance
> themselves from Lisa, and her co-defendant Marcella
> Williams, the mother of Devontae [sic].

Id. at 228.  Cummings recited in his affidavit things that he
considered qualified him to participate as trial attorney for
petitioner, and discussed in a general way activities of
petitioner's defense team, consisting of Heiskell, Cummings, John
Ladd ("Ladd"), an experienced private investigator, and Toni Knox
("Knox"), an experienced mitigation investigator.  Id. at 230-31.
The parts of the Cummings affidavit having direct relevance to
petitioner's complaints that her trial counsel should have called
Tonya and Sharon as trial witnesses were as follows:

> Ms. Knox interviewed over two dozen family members,
> including Sharon Coleman and Tonya Coleman, and
> prepared summaries of those interviews that were shared
> with each team member as email attachments.  (See
> attached Confidential Memorandum for an example)  The
> strengths and weaknesses of each of those family
> members as potential witnesses were considered and
> discussed. . . .
>
> Toni Knox was an essential member of the trial
> team.  Ms. Knox interviewed every family member she
> could locate and provided written reports for Mr.
> Heiskell and I to review.

Id. at 231.

Cummings attached to his affidavit a confidential memorandum prepared by Knox pertaining to her interviews of members of petitioner's family, including Sharon, petitioner's mother, and Yvonne Coleman, a sister of petitioner. Id. at 245-48. Knox's memorandum indicates that the family members were cooperative in the sense that they freely talked to her, and indicated a desire to cooperate. Id. at 245. In reference to the portion of the interview pertaining to Davontae's activities, Knox stated the following in her memorandum:

> He was uninterested in going outside to play or any activity that didn't involve eating. Sharon stated that in order to get him to go outside for a picture or to play with the other children, everyone in the apartment had to go outside and lock the doors. All stated that Devontae [sic] was difficult to manage and took all of them to do it when he was there. They talked about the frustration and anguish that both Marcella and Patricia had in trying to manage him. When he was attending school, the school called every day for them to come and pick him up. In the cafeteria, he would attempt to take other children's food and the teacher could not manage him in class. Marcella had tried to get help from CPS with Devontae [sic] and had even attempted to give him up for adoption or see if she could leave him at the fire station. CPS threatened Marcella that if she gave up Devontae [sic], they would take the two girls also.

Id. at 246.

Also accompanying the Cummings affidavit was a listing of work he did in preparation for petitioner's trial. Id. at 232-44. He included in an entry dated June 28, 2005, the

21

following description of what Knox told him concerning possible

harm family members could do to petitioner's defense if called as

witnesses:

> Ms. Knox informed me that the majority of the client's
> family shares the opinion that the deceased was
> neglected by the defendants and was locked up in the
> apartment without care.  Ms. Knox is concerned that the
> state will use those family members against the client
> if they become aware of their knowledge.  Ms. Knox has
> not put that information in any communication to me
> through concerns that it would hurt the client.

Id. at 236.

On March 31, 2009, counsel for the State filed proposed

findings of fact and conclusions of law to be considered by the

state trial court in ruling on petitioner's state habeas

application.  Id. at 258-73.  The proposed findings of fact that

appear to have relevance to petitioner's Claim for Relief Number

One are the following:

> 1-4-B  The State's open file policy was in effect in
> this case from the time that Mr. Heiskell and Mr.
> Cummings were appointed.
>
> . . . .
>
> 1-4-E  Applicant's family never told trial counsel the
> facts stated in their current affidavits.
>
> 1-4-F  Applicant's family was difficult to talk to and
> was not willing to assist trial counsel.
>
> 1-4-G  When Applicant's family did speak to trial
> counsel, they did not provide relevant, rational,
> and/or credible evidence which would either negate an

element of the offense or mitigate punishment for the offense.

. . . .

3-D  Applicant's trial attorney had access to and interviewed Applicant's family members.

3-E  Applicant's family members were generally unwilling to speak to her trial attorneys, and provided only disjointed, rambling commentary that was not relevant or credible regarding the Applicant's guilt.

. . . .

3-I  Applicant's co-conspirator did not testify at Applicant's trial as she was under indictment for the instant offense, and subsequently pled guilty to capital murder of [Davontae].

. . . .

3-K  The statements contained in the affidavits of Applicant's co-conspirator and sister regarding [Davontae's] condition less than 24 hours before his death are not supported by the vast majority of the medical evidence.

3-L  The statements contained in the affidavits of Applicant's co-conspirator and sister regarding [Davontae's] condition less than 24 hours before his death are not credible or worthy of belief.

. . . .

3-N  [Williams's] consent or lack thereof to Applicant's restraint and murder of her child are irrelevant to the issue of Applicant's guilt. Therefore, her statements to this effect have not been considered.

3-O  Applicant has not shown, by a preponderance of the evidence, that no reasonable juror would have convicted

her in light of the evidence she alleges as "newly
discovered."

Id. at 261-63 (record references omitted).

In addition, the State court proposed the following mixed
findings of fact and conclusions of law bearing on the subject of
Claim for Relief Number One:

> A.   Applicant has wholly failed to meet her burden to
>      plead and prove by a preponderance of the evidence
>      that: (1) trial counsels' performance was
>      deficient; and (2) trial counsels' deficient
>      performance prejudiced the defense. See Strickland
>      v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052,
>      2064 (1984); McFarland v. State, 928 S.W.2d
>      482,500 (Tex. Crim. App. 1996), cert. denied, 117
>      S. Ct. 966 (1997). Accordingly, the Court strongly
>      presumes that all of trial counsels' conduct fell
>      within the wide range of reasonable professional
>      assistance and that their actions were sound trial
>      strategy. See Jackson v. State, 877 S.W.2d 768,771
>      (Tex. Crim. App. 1994).

Id. at 266.

The state trial court adopted the State's proposed findings
of fact and conclusions of law as its own, and ordered that they
be transmitted to the clerk of the Court of Criminal Appeals as
required by law.[9]   Id. at 283.

---

[9]Texas habeas procedure contemplates that the state trial court (referred to as the "convicting
court") will initially make findings of fact and conclusions of law in a state death penalty habeas
proceeding, after having considered the record and proposed findings of fact and conclusions of law
submitted by the parties, and will then transmit to the Court of Criminal Appeals the state trial court's
findings of fact and conclusions of law, along with other material, following which the court of criminal
appeals, upon reviewing the material submitted to it by the state trial court, is to make its decision. TEX.
CODE CRIM. PROC. art. 11.071, §§ 8, 9, and 11.

By order signed March 31, 2010, the Court of Criminal Appeals remanded petitioner's state habeas application for the following additional proceedings:

> The trial court shall determine whether applicant's trial counsel interviewed Marcela Williams. If trial counsel did not, the trial court shall determine why trial counsel did not do so. If counsel did interview Marcela Williams, the trial court shall determine why Marcela Williams was not called to testify. The trial court may use any means set out in TEX. CODE CRIM. PROC. art. 11.071 §§ 8 or 9.
>
> The trial court shall make findings of fact as to whether applicant's trial counsel interviewed Marcela Williams. If trial counsel did not do so, the trial court shall make findings of fact regarding the reasons trial counsel did not do so. If trial counsel did interview Marcela Williams, the trial court shall make findings of fact addressing why Marcela Williams was not called to testify. The trial court shall also make any other findings of fact and conclusions of law that it deems relevant and appropriate to the disposition of applicant's claim for habeas corpus relief.

Supplemental Clerk's Habeas R. at 2.

In response to the remand order, the state trial court ordered that Heiskell and Cummings each file an affidavit addressing the following issues:

> 1)   Whether counsel interviewed Marcela Williams.
>
> 2)   If counsel did not interview Marcela Williams, why did he not interview her?

25

> 3)   If counsel did interview Marcela Williams, why did
>      he not call her to testify as a witness?

Id. at 7.  Heiskell responded by filing an affidavit he made on

April 15, 2010, in which he, in effect, said that he did not

pursue use of Williams as a trial witness because he knew that

she would not testify, and would assert her Fifth Amendment

privilege, inasmuch as she was under a capital murder indictment,

facing the death penalty for Davontae's death, and was

represented by a prudent and competent counsel who would not have

consented to anyone interviewing his client during the pendency

of her case.  Id. at 14.  Cummings responded by an affidavit that

gave essentially the same explanation as Heiskell gave for nonuse

of Williams as a trial witness.  Id. at 15-16.  Cummings added in

his affidavit that before petitioner's trial he had been given

copies of statements Williams had made to the police and CPS

incriminating petitioner in the neglect and physical abuse of

Davontae that led to his death, id. at 16, ¶ 2.c, copies of which

he attached to his affidavit.  Id. at 17-26.  Those items did,

indeed, show that Williams said things shortly after Davontae's

death that were highly incriminating against petitioner, and, if

used for cross-examination of Williams had she been called to

testify for petitioner at trial, would have destroyed any

effectiveness Williams might otherwise have had as a witness for petitioner.

In the statement Williams gave to a detective with the Arlington police department on July 26, 2004, the date of Davontae's death, Williams said:  For the preceding two weeks at least Davontae had not been alone with anyone other than her or petitioner, and that "sometimes after [petitioner] had been alone with Davontae [she] would notice unexplainable injuries on Davontae"; Davontae was so hyper that sometimes petitioner had to tie his arms together with electric cord to keep him from tearing up the kitchen; sometime during the preceding month petitioner tied Davontae's legs to her arms or her legs using the kind of cord that goes to a computer game; and, she knew that it was wrong for her not to make petitioner leave her apartment when petitioner was abusing Davontae, but she was in love with petitioner.  Id. at 20-21.

She said in a statement she gave to the same detective the following day, July 27, 2004, that sometimes she would tie Davontae's arms together with shoestrings, and that petitioner tied his arms together too tight with electric cord, causing deep cuts on his arms.  Id. at 22.  She said that she did not take Davontae to the hospital when she realized a few days before he died that he was weak, "because he had those marks on him and

27

[she] knew they would call CPS and [she] did not want CPS to take [her] kids." Id. at 23.

In Williams's interview with a representative of CPS on August 3, 2004, Williams said that she and petitioner always had fights over petitioner abusing Davontae. Id. at 24. When asked what happened to Davontae's lip, Williams said that petitioner "accidently popped" Davontae in his mouth and cut his lip, and when asked about the marks on Davontae's wrists, Williams said that they were from the electric cord being too tight. Id. at 26.

After the new Heiskell and Cummings affidavits were filed, the State, on June 9, 2010, filed another set of proposed findings of fact and conclusions of law, this set directed to the issue as to which petitioner's application was remanded to the state trial court. The added proposed findings pertinent to petitioner's Claim for Relief Number One were as follows:

> 2.   During the entire pendency of Applicant's case through the jury verdict, [Williams] faced the same charge as Applicant, and her case was active. The State did not waive the death penalty until after the completion of Applicant's jury trial.

> 3.   Both trial counsels were familiar with [Williams's] court-appointed attorneys. Based on their experiences as competent, experienced counsels themselves, as well as long familiarity with [Williams's] attorneys, both trial counsels knew that any request to interview [Williams] would be refused

28

due to the severity of the charges facing her and her
incriminating statements to the police and CPS.

Id. at 28-29 (record references omitted).  And, the State

proposed mixed findings of fact and conclusions of law identical

to the "A" paragraph set forth above.  Supra at 24.

On June 23, 2010, the state trial court adopted the State's

proposed findings and conclusions as its own, and ordered that

they be transmitted to the Court of Criminal Appeals as required

by law.  Supplemental Clerk's Habeas R. at 37.  On August 25,

2010, the Court of Criminal Appeals, after adopting the state

trial court's findings and conclusions, denied petitioner's state

habeas application.  Ex parte Coleman, No. WR-72,094-01 (Tex.

Crim. App. Aug. 25, 2010) (per curiam).

After having reviewed the record created in the state court

pertinent to petitioner's Claim for Relief Number One, the court

cannot find in favor of petitioner as to either prong of the

ineffective-assistance-of-counsel test in respect to trial

counsel's failure to use Tonya, Sharon, or Williams as a trial

witness for petitioner.  If the kidnapping issue had been a close

one, the use of Williams as a witness probably would have been a

factor tipping the scale in favor of a conviction.  In fact, the

kidnapping issue was not close.  The trial evidence was so

persuasive that petitioner had committed the elements of capital

murder, including kidnapping, that there is no reasonable basis for a contention that the use of Tonya, Sharon, or Williams, or all of them, as trial witnesses for petitioner would have improved her chances of not being convicted of capital murder of Davontae.   The nonuse of those witnesses did not deprive petitioner of a fair trial that had reliable results or undermine confidence in the outcome.

The only finding of the state court that is of questionable accuracy is that petitioner's family was not willing to assist trial counsel.   There is information in the state court record that certain members of petitioner's family were anxious to assist trial counsel.   But that is an irrelevant fact inasmuch as any assistance they might have provided probably would have caused petitioner more harm than good in her criminal trial defense.

The court cannot find, or conclude, that the failure of petitioner's trial counsel to present the testimony of Tonya, Sharon, or Williams constituted ineffective assistance of counsel, or that the outcome of petitioner's trial would have been more favorable to her if the testimony of any or all of those persons had been presented by petitioner's counsel.   The court cannot find that the performance of petitioner's counsel in not calling the witnesses was deficient, or that by failing to

call the witnesses her counsel made errors so serious that they
were not functioning as the "the counsel" guaranteed to
petitioner by the Sixth Amendment.  She received at least
reasonably effective assistance of counsel--indeed, the court
finds that petitioner's counsel provided her excellent trial
representation, considering the nature of the evidence against
petitioner.  The court cannot find that an attorney providing
reasonably effective assistance to petitioner would have used
Tonya, Sharon, or Williams as a trial witness for petitioner.
Needless to say, petitioner has failed to show by clear and
convincing evidence that any finding of fact of the state court
pertinent to Claim for Relief Number One was incorrect.

B.   <u>Claim for Relief Number Two</u>

     Petitioner summarized the legal and factual basis for her
Claim for Relief Number Two as follows:

> Ms. Coleman's legal team failed to adequately
> investigate and present mitigation evidence.
> Specifically, the facts and circumstances surrounding
> Applicant's trial and the pre-trial investigation show
> that her legal team failed to thoroughly investigate
> her mitigation evidence.  The mitigation evidence was
> not effectively presented at trial.  These failures
> resulted in a violation of Applicant's Sixth Amendment
> Rights to effective assistance of counsel and require
> that Applicant be given a new punishment trial.

Mem. in Supp. of Pet. at 23.

The state court's findings of fact pertinent to Claim for

Relief Number Two are as follows:

> 1-4-A  Applicant's bare assertion that counsel made no
> effort to investigate or find mitigating evidence is
> unsupported by the record.

> . . . .

> 1-4-C  Both trial counsel were fully aware of all of
> the evidence that the State intended to offer against
> Applicant and had a detailed discussion with Applicant
> about the evidence that would be presented at both
> phases of the trial.

> 1-4-D  Both trial counsel sought the assistance of a
> mitigation expert and used her advice to formulate a
> strategy in an effort to convince the jury that
> Applicant should not be assessed the death penalty.

> . . . .

> 1-4-G  When Applicant's family did speak to trial
> counsel, they did not provide relevant, rational,
> and/or credible evidence which would either negate an
> element of the offense or mitigate punishment for the
> offense.

> . . . .

> 1-4-I  Although Applicant suggests that additional
> mitigation evidence could have been discovered and
> presented at trial, she fails to present any evidence
> to support her allegation and fails even to identify
> the sources of such evidence.

> 1-4-J  Applicant has failed to introduce any additional
> admissible, material evidence, other than that already
> introduced at trial, relevant to the following factors
> of mitigation: (a) the circumstances of the offense;
> (b) family dynamics; (c) extreme poverty; (d)
> "neurologic deficits"; (e) psychiatric illness; (f)
> medical conditions with psychiatric consequences; (g)
> mental retardation; (h) "child maltreatment" or abuse;

(i) good character; (j) chronological age; (k)
community violence; (l) dislocation and immigration;
(m) effects of conditions of confinement; (n) good
conduct while incarcerated; (o) remorse; (p) future
dangerousness; (q) duress at the time of the offense;
(r) minor participation; (s) circumstances of prior
offenses; (t) and cultural background.

1-4-K  Applicant has failed to prove by a preponderance
of the evidence that her trial counsel's investigation
of possible mitigating evidence was "unreasonable" in
light of what background evidence was available to
counsel before trial.

1-4-L  Applicant has failed to prove by a preponderance
of the evidence that her trial counsel failed to
uncover any admissible, material mitigating evidence.

Clerk's Habeas R. at 261-62 (record references omitted).  The

state court's mixed findings of fact and conclusions of law that

are set forth under the immediately preceding subheading of this

memorandum opinion apply to Claim for Relief Number Two as well

as others.  <u>Supra</u> at 24.  Also pertinent here is the state

court's following mixed findings of fact and conclusions of law:

C.  The aggravating factors - e.g., the horrible facts
of this premeditated crime, Applicant's history of
criminal behavior, including gang membership, --
clearly would not have been outweighed by the
incredible evidence that Applicant claims her
trial counsel should have presented. See, e.g.,
Strickland v. Washington, 466 U.S. 668, 700, 104
S. Ct. 2052, 2071 (1984) (given overwhelming
aggravating factors, there was no reasonable
probability that omitted evidence would have
changed the conclusion that a death sentence was
warranted); Bonin v. Calderon, 59 F.3d 815, 836
(9th Cir. 1995) ("where the aggravating
circumstances are overwhelming, it is particularly

> difficult to show prejudice at sentencing due to
> the alleged failure to present mitigation
> evidence"), cert. denied, 516 U.S. 1051, 116 S.
> Ct. 718 (1996).

Clerk's Habeas R. at 267.

The court is not persuaded by anything in the record that trial counsel failed to conduct an adequate mitigation investigation or present available mitigation evidence.[10] The state habeas record affirmatively discloses that the trial defense team thoroughly investigated potential mitigation evidence, and the record of the trial itself affirmatively establishes that defense counsel presented the evidence as effectively as could be expected at trial. There is no suggestion in the petition of anything that would have been gained by further mitigation investigation or that any further mitigation evidence was available that, if presented at trial,

---

[10]Petitioner pitches most of her argument that there was not a thorough mitigation investigation on the contents of the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. Mem. in Supp. of Pet. at 57-60. Even if petitioner had provided the court with reasoned factual support for a contention that the ABA Guidelines were not followed, the court would not be persuaded. As Justice Alito noted in his concurring opinion in Bobby v. Van Hook:

> The ABA is a venerable organization with a history of service to the bar, but it is, after all, a private group with limited membership. The views of the association's members, not to mention the views of the members of the advisory committee that formulated the 2003 Guidelines, do not necessarily reflect the views of the American bar as a whole. It is the responsibility of the courts to determine the nature of the work that a defense attorney must do in a capital case in order to meet the obligations imposed by the Constitution, and I see no reason why the ABA Guidelines should be given a privileged position in making that determination.

558 U.S. ___, 130 S. Ct. 13, 20 (2009) (Alito, J., concurring) (per curiam).

would have caused the jury to be less likely to make its findings that led to imposition of the sentence of death.

The circumstance that petitioner's trial counsel filed a last-minute emergency supplement to their motion to continue proves no more than that trial counsel probably were desperate to delay petitioner's trial as long as possible because of their knowledge that the facts that would be brought to the jury's attention probably would result in a sentence of death.   The March 4, 2009 affidavit of Cummings and the attachments disclose that petitioner's trial team did all they reasonably could be expected to do to develop for presentation at trial all relevant mitigation evidence.   Id. at 230-57.

The court cannot find, or conclude, that the failure of petitioner's trial counsel to conduct a greater investigation for mitigation evidence or to present more mitigation evidence constituted ineffective assistance of counsel, or that the outcome of petitioner's trial would have been more favorable to her if counsel had conducted further investigation for mitigation evidence and had presented whatever additional evidence might have been located by such an investigation.   The court cannot find that the performance of petitioner's counsel relative to mitigation was deficient, or that her counsel made errors so

serious that they were not functioning as "the counsel" guaranteed to petitioner by the Sixth Amendment. Petitioner's counsel were reasonably effective in the assistance they provided to her in their location and presentation of mitigation evidence. The court cannot find that an attorney providing reasonably effective assistance to petitioner would have conducted additional investigation for mitigation evidence, or would have presented any additional evidence at the punishment phase of her trial. The conduct of petitioner's counsel relative to the issue of mitigation did not deprive petitioner of a fair trial or of a trial whose results were reliable or undermine confidence in the outcome. Petitioner has failed to show by any evidence, much less by clear and convincing evidence, that the state court's findings of fact pertinent to Claim for Relief Number Two are incorrect.

C.   Claim for Relief Number Three

Petitioner summarized the factual and legal basis for her Claim for Relief Number Three as follows:

> Ms. Coleman is actually innocent of the crime of conviction. She did not commit a kidnapping as required to support a capital murder conviction. Evidence obtained from Brown, Coleman, and Williams clearly shows that Applicant did not commit or attempt to commit a kidnapping. This evidence was not available because Applicant's attorneys failed to adequately investigate the facts of this case and is

36

> inexorably intertwined with Applicant's claim of
> ineffective assistance of trial counsel.  The evidence
> from Brown, Coleman, and Williams establishes by clear
> and convincing evidence that no reasonable juror could
> have convicted Applicant of the charged offense of
> capital murder because there was no kidnapping and
> mandates a finding that Applicant is not guilty of
> capital murder.

Mem. in Supp. of Pet. at 23.

Claim for Relief Number Three is essentially a reworded

version of petitioner's Claim for Relief Number One, with the

added twist that she contends that the information provided in

the affidavits of Tonya and Sharon and the unsworn declaration of

Williams constitutes new evidence, and that if that evidence had

been used at trial the jury would not have convicted petitioner

of the offense of capital murder because the jury would not have

found that there was a kidnapping.  For the reasons discussed

under the foregoing analysis of petitioner's Claim for Relief

Number One, Claim for Relief Number Three is without merit.  If

defense counsel had been able to present, and had presented, at

petitioner's trial the testimony of Tonya, Sharon, and Williams,

the outcome of the trial in all probability would have been no

different.  Testimony that could have been elicited, perhaps by

cross-examination, from one or more of those witnesses at trial

probably would have enhanced the likelihood that the jury would

find petitioner guilty of capital murder.

The court does not consider that the information provided in
the Tonya and Sharon affidavits and the Williams unsworn
declaration qualifies as "newly discovered" or "newly available"
evidence.  Even if one were to assume, _arguendo_,  that the
statements made in those documents were true, petitioner would
have known of the facts recited in the documents.  None of the
information would have been newly discovered to her or newly
available to her.  Moreover, the undisputed facts that were
received into evidence so directly went against the information
in the affidavits and declaration that the jury in all
probability would have rejected the information in those
documents out of hand.  If the affiants and declarant had given
testimony in exact conformity with the statements in the
affidavits and declaration, their testimony would have been so
subject to effective cross-examination that the jury probably
would not have believed a thing any of them said from the witness
stand.

As to petitioner's reliance on the part of the unsworn
declaration of Williams that suggested that she consented to
petitioner's conduct in restraining Davontae, the court mentions
again that the state court record establishes that, because of
the capital murder charge pending against her, Williams was not

available to testify at petitioner's trial.  A finding of fact
made by the state court was that "Applicant's co-conspirator did
not testify at Applicant's trial as she was under indictment for
the instant offense, and subsequently pled guilty to capital
murder of [Davontae]."  Clerk's Habeas R. at 263.  Moreover,
evidence from Williams that she had consented to petitioner's
abusive conduct toward Davontae probably would not have made any
difference in the trial outcome.  The jury undoubtedly inferred
from the evidence that was received at trial that Williams had a
role, and was implicated, in the conduct that constituted a
"kidnapping" of Davontae and the broader conduct that led to
Davontae's death.

Another finding of fact of the state court pertinent to
Claim for Relief Number Three was that "Applicant has not shown,
by a preponderance of the evidence, that no reasonable juror
would have convicted her in light of the evidence she alleges as
'newly discovered.'"  Id. at 263.  Other mixed findings of fact
and conclusions of law of the state court pertinent to Claim for
Relief Number Three are as follows:

> B.    Applicant's allegations regarding Marcella
>       Williams do not involve "newly discovered"
>       evidence.  See Ex parte Elizondo, 947 S.W.2d 202,
>       209-10 (Tex. Crim. App. 1996); Holmes, 885 S.W.2d
>       at 398.

C.   Applicant has wholly failed to meet her burden to
plead and prove, by a preponderance of the
evidence, that no reasonable juror would have
convicted him [sic] in light of the new evidence.
*See Ex parte Elizondo*, 947 S.W.2d 202, 209-10
(Tex. Crim. App. 1996); *Holmes*, 885 S.W.2d at 398.

Id. at 268.  None of the findings of fact of the state court

pertinent to Claim for Relief Number Three have been shown by

clear and convincing evidence to be incorrect.

D.   <u>Claim for Relief Number Four</u>

Petitioner summarized the factual and legal basis for her

Claim for Relief Number Four as follows:

Ms. Coleman's conviction for the offense of the injury
to a child would have become final prior to her
conviction for capital murder if her conviction for the
Injury to a Child offense had not been appealed to the
Second Court of Appeals in Fort Worth and allowed to
become final.  In such event, Applicant's capital
murder conviction would have been barred by the
application of the prohibition against double jeopardy.
The failure to allow her conviction for injury to a
child to become final prior to her capital murder
conviction resulted in a violation of Applicant's Sixth
Amendment Rights to effective assistance of counsel and
mandates a finding that Applicant is not guilty of
capital murder.

Mem. in Supp. of Pet. at 24.

State court findings of fact pertinent to Claim for Relief

Number Four include the following:

2-A  Applicant's appeal of her conviction for injury to
a child was timely filed with the Fort Worth Court of
Appeals on July 12, 2006 as cause number 02-06-00231-
CR.

> 2-B  On May 17, 2007, her appeal was abated until
> resolution of her direct appeal of the capital murder
> conviction.
>
> .  .  .  .
>
> 4-A  In one trial, Applicant was convicted of capital
> murder and injury to a child.
>
> 4-B  The first count submitted to the jury charged
> Applicant with intentionally or knowingly, while in the
> course of committing (or attempting to commit)
> kidnapping, causing the death of [Davontae] by either
> depriving him of adequate food or by starving him and
> inflicting physical injury to him.
>
> 4-C  The second count submitted to the jury charged
> Applicant with knowingly by omission causing serious
> bodily injury to [Davontae], a child less than 15 years
> of age by depriving him or [sic] adequate medical care
> and adequate food at a time when Applicant assumed
> care, custody, or control of [Davontae].
>
> 4-D  Each of these counts required proof of elements
> that the other did not.

Clerk's Habeas R. at 262, 264 (record references omitted).  Mixed

findings of fact and conclusions of law of the state court

pertinent to Claim for Relief Number Four are as follows:

> A.   Applicant's appellate counsel properly and timely
>      filed a notice of appeal for the injury to a child
>      conviction with the Fort Worth Court of Appeals.
>      TEX. R. APP. P. 71.1; TEX. CODE CRIM. PROC. ANN. arts.
>      4.03 and 4.04.
>
> B.   The Fort Worth Court of Appeals is the proper
>      appellate court to consider claims regarding this
>      conviction.  <u>Callins v. State</u>, 726 S.W.2d 555, 558
>      (Tex. Crim. App. 1986).

Clerk's Habeas R. at 268-69.

Petitioner raised her double jeopardy claim as a point of error on her direct appeal to the Court of Criminal Appeals, which rejected her claim with the following explanation:

> . . . Coleman contends that her federal and state constitutional protections against double jeopardy were violated. She argues that, based on the facts and circumstances of this case, serious bodily injury to a child is a lesser-included offense of capital murder.
>
> This claim is not properly before us on this appeal. Because the remedy for any double jeopardy violation in this instance is to set aside the injury-to-a-child conviction and sentence, we conclude that Coleman's claim does not constitute a challenge to her capital murder conviction and death sentence. This claim would be properly before the court of appeals on direct appeal from her injury-to-a-child conviction.

Coleman, 2009 WL 4696064, at *7 (footnotes omitted). Petitioner has not persuaded the court that the ruling of the Court of Criminal Appeals on this subject is incorrect.

Petitioner has failed to show by clear and convincing evidence that any of the state court findings pertinent to her Claim for Relief Number Four are not correct. She has not shown that the capital murder and injury to a child charges were the "same offense" for the purposes of double jeopardy.[11] Petitioner has two other problems with her double jeopardy theory. First,

---

[11]The injury-to-a-child offense does not appear to qualify as a lesser-included offense under the applicable Texas statute. TEX. CODE OF CRIM. PROC. art. 37.09. See also Williams v. State, 294 S.W.3d 674, 680-82 (Tex. App.--Houston [1st Dist.] 2009, pet. ref'd). Petitioner does not challenge the finding of the state court that each of the counts of the indictment required proof of elements that the other did not.

"[t]he double jeopardy clause does not impose a limitation on the legislative prerogative to prescribe the scope of punishment," Johnson v. State, 208 S.W.3d 478, 510-11 (Tex. App.--Austin 2006, pet. ref'd.); second, even if there were an otherwise improper imposition of multiple punishments for the same conduct, the remedy would be to affirm the conviction for the most serious offense and vacate the other conviction, Bigon v. State, 252 S.W.3d 360, 372-73 (Tex. Crim. App. 2008). The court is not persuaded that petitioner was convicted of more offenses than the Legislature intended; and, even if she was, the conviction and punishment that would be affirmed would be the most serious, her capital murder conviction and death sentence. Petitioner's appellate counsel's decision to allow her capital murder appeal to be concluded first was a strategic one based, in part, on his awareness of "case authority providing that in situations where there were multiple convictions and sentences imposed in violation of double jeopardy, reviewing courts are to affirm the 'greater' conviction, which here would mean sustaining the death sentence for capital murder." Clerk's Habeas R. at 225. Counsel acted reasonably in making his decision.

Thus, petitioner has failed to establish either of the Strickland ineffective-assistance-of-counsel elements as to her

Claim for Relief Number Four.  Appellate counsel took the proper
procedural step in delaying an appellate decision as to the
injury-to-a-child charge before there was an appellate decision
as to the capital murder charge; and, in any event, the fact of
the delay did not prejudice petitioner in any respect.

E.   Claim for Relief Number Five

Petitioner summarized the factual and legal basis of her
Claim for Relief Number Five as follows:

> The evidence relied on to support the jury's finding of
> future dangerousness consisted of the facts of the
> indicted crime and the facts of the extraneous offense.
> Admittedly, the circumstances of the underlying offense
> alone may be sufficient to support a jury's affirmative
> answer to the issue on future dangerousness.  However,
> when all of the evidence is considered, no rational
> juror would find a probability that Applicant will
> commit future crimes of violence so as to be a
> continuing threat to society.  Consequently, this Court
> should hold that the evidence is insufficient to
> support the jury's finding on Special Issue Number One,
> vacate Applicant's death sentence, and reform the
> judgment to reflect a sentence of life in prison.

Mem. in Supp. of Pet. at 24.

The claim made by Claim for Relief Number Five was a claim
of trial court error presented by petitioner to the Court of
Criminal Appeals in her direct appeal.  That court considered
petitioner's claim and ruled against her.  Coleman, 2009 WL
4696064, at *12-13.  After a review of the record, the court
agrees with the finding of the state court that "[a] rational

jury could determine from [the] evidence that, beyond a reasonable doubt, there was a probability that Applicant would commit criminal acts of violence in the future so as to constitute a continuing threat to society." Id. at *13. Petitioner has presented nothing that would amount to clear and convincing evidence that the findings of the state court pertinent to Claim for Relief Number Five were not correct.

F.    Claim for Relief Number Six

Petitioner summarized the factual and legal basis for her Claim for Relief Number Six as follows:

> Under the present Texas statute applied to Applicant, the jury has again been given unfettered discretion that both invites and permits arbitrary application of the ultimate penalty.  This violates Ms. Coleman's Eighth Amendment right to be free from the arbitrary and capricious infliction of the death penalty.

Mem. in Supp. of Pet. at 24.

Again, petitioner presents a claim that duplicates a point of error that she unsuccessfully raised on her direct appeal. Coleman, 2009 WL 4696064, at *14.  The part of the state trial court's charge to the jury about which petitioner complains in her Claim for Relief Number Six was the question submitted to the jury at the punishment phase worded as follows:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the

> personal moral culpability of the defendant, there is a
> sufficient mitigating circumstance or circumstances to
> warrant that a sentence of life imprisonment rather
> than a death sentence be imposed.

Clerk's Habeas R. at 183.  In <u>Penry v. Johnson</u>, 532 U.S. 782, 803

(2001), the Supreme Court indicated that this mitigation issue

probably was a satisfactory method of focusing the jury on

mitigating factors and evidence.  The holding of the Supreme

Court in <u>Tuilaepa v. California</u>, 512 U.S. 967, 979-80 (1994),

supports the contention of the State that a broad mitigation

issue of the kind in question is appropriate once the jury has

found that the defendant is a member of the class made eligible

for the death penalty, a finding that was made in this case by

the verdict of the jury at the guilt-innocence stage of the

trial.  In <u>Johnson v. Cockrell</u>, 306 F.3d 249, 256 (5th Cir.

2002), the Fifth Circuit noted that no authority had been cited

to support a position virtually identical to the one petitioner

takes in her Claim for Relief Number Six; and, the Fifth Circuit

went on to say that, even if it were to decide that the claim had

merit, it would not be at liberty to create a new rule and to

apply it retroactively.  For similar reasons, petitioner's Claim

for Relief Number Six must be denied.

G.    Claim for Relief Number Seven

Petitioner summarized the factual and legal basis of her

Claim for Relief Number Seven as follows:

> Ms. Coleman's Fourteenth Amendment right to due process
> and Eighth Amendment rights as interpreted in *Penry* v.
> *Johnson* were violated because the mitigation special
> issue set forth in the Texas death penalty statute
> sends mixed signals to the jury thereby rendering any
> verdict reached in response to that special issue
> intolerably unreliable.

Mem. in Supp. of Pet. at 24.

Petitioner's "mixed signals" contention was rejected in

Scheanette v. Quarterman, 482 F.3d 815, 824-27 (5th Cir. 2007).

Nothing has occurred since Scheanette to resuscitate such a

contention.

*     *     *     *     *

The court has not been persuaded that any adjudication of

the state court relevant to petitioner's claims for relief (1)

resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established federal law, as

determined by the Supreme Court of the United States, or (2)

resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in

the state court proceedings.  Nor has the court been persuaded by

clear and convincing evidence that any determination of a fact

47

issue made by the state court is incorrect.   Thus, petitioner's petition for writ of habeas corpus should be denied.

Therefore,

The court ORDERS that petitioner's requests for an evidentiary hearing be, and are hereby, denied.

The court further ORDERS that petitioner's petition for a writ of habeas corpus pursuant to the authority of 28 U.S.C. § 2254 by a person in state custody be, and is hereby, denied.

SIGNED January 20, 2012.

JOHN McBRYDE
United States District Judge